# CHARLESTON.

HARNESS *et ux. v.* EASTERN OIL CO. *et al.*

Decided March 16, 1901.

1. OIL LEASE—*Lessors Joint Interest.*

   T. B. H. and A. K. H., his wife, leased together in one lease two tracts of land lying contiguous to each other, one hundred and fifty-two acres belonging to T. B. H. and thirty-five and one-half to A. K. H., as one tract of one hundred and eighty seven and one-half acres, for oil and gas purposes. A well was bored on the one hundred and fifty-two acres; the proceeds cash rental for gas paid to both lessors, and receipted for by them jointly, and the royalty of oil run into the pipe lines to their joint credit. *Held* to be a joint lease of one tract of one hundred and eighty-seven and one-half acres, as between the lessors and lessee. (p. 243).

2. LEASE—*Consideration—Date of Payment.*

   Such lease being "in consideration of the sum of twelve hundred and fifty dollars, the receipt of which is hereby acknowledged, * * * parties of the first part do hereby grant unto * * *, second party, his heirs and assigns, all the oil and gas in and under the following premises," describing them, with the right to enter and drill and operate for oil, gas, etc., reserving to themselves one-eighth of the oil produced, to be run into pipe line to their credit. "Term of lease two years, and as much longer as oil or gas is found in paying quantities. If gas only is found, second party agrees to pay two hundred and fifty dollars each year, quarterly in advance, for the product of each well while the same is being used off the premises. Gas free for dwelling house purposes,"—the production in paying quantities of either gas or oil, and the payment of gas rental or the delivery of one-eighth of the oil royalty, in the pipe line, as stipulated, will perpetuate the lease during the time of such production. (p. 243).

3. LEASE—*Development—Lessors' Remedy.*

   Lessors' remedy for failure on part of lessee to further develop the leased premises, or to properly protect the lines thereof from drainage through wells on adjacent property, is ordinarily by action at law for damages. (p. 247).

Appeal from Circuit Court, Pleasants County.

Bill by Thomas B. and Anna K. Harness against the Eastern

Oil Company and others. Decree for complainants. Defendants appeal.

Reversed.

VAN WINKLE & AMBLER, for appellants.

V. B. ARCHER and WILLIAM BEARD, for appellees.

McWHORTER, JUDGE:

Thomas B. Harness and Anna K. Harness, his wife, executed the following lease:

"In consideration of the sum of twelve hundred and fifty dollars, the receipt of which is hereby acknowledged, Thomas B. Harness and Anna K. Harness, his wife, of Pleasants County, West Virginia, first parties, do hereby grant unto M. Finnegan, of Pittsburg, second party, his heirs and assigns all the oil and gas in and under the following described premises, together with the right to enter thereon at all times for the purpose of drilling and operating for oil, gas or water, and to erect and maintain all buildings and structures and lay all pipes necessary for the production and transportation of oil, gas or water taken from said premises, excepting and reserving, however, to first parties the one-eighth part of all oil produced and saved from said premises, to be delivered in the pipe line with which second party may connect their wells, namely: All that certain tract of land situare in the district of Grant, county of Pleasants in the State of West Virginia, bounded and described as follows, to-wit: on the north by the Ohio river; on the east by lands of W. S. Harness, Sarah A. Bumgardner and Bell Bros.; on the south by lands of Bell Bros. and C. Williamson and Bull Creek; on the west by lands of Coffin, Alimass & Co. and' Ambrozine Ross, known as the river farm of one hundred and fifty-two acres, belonging to T. B. Harness. And the back lands of thirty-five and one-half acres belonging to Anna K. Harness, containing one hundred and eighty-seven and one-half acres more or less, to have and to hold the above premises on the following conditions: Term of lease two years and as much longer as oil or gas is found in paying quantities. If gas only is found, second party agrees to pay two hundred and fifty dollars each year, quarterly in advance for the product of each well while the same is being used off the premises. Gas free for dwelling house purposes. No well shall be drilled nearer than ten rods to any building now on said

premises, without the consent of first party.   In case no well is completed within sixty days from this date, then this grant shall become null and void, unless second party shall pay to said first party one hundred dollars for each month, thereafter such completion is delayed. Rentals payable at the Second National Bank of Parkersburg.   The second party shall have the right to use sufficient gas, oil or water to run all necessary machinery for operating said wells, and also the right to remove all its property at any time.   And all conditions between the parties hereto shall extend to their heirs, executors, administrators and assigns forever.   It is hereby agreed and understood that if the well now drilling on the Angus farm should make twenty-five barrels of oil per day for thirty days after completion then second party shall pay to first party an additional bonus of seven hundred and fifty dollars, if the first well on these premises shall produce twenty-five barrels of oil for thirty days after completion an additional bonus of five hundred dollars shall be paid.   Now it is also understood that if the Angus well should produce less than twenty-five barrels of oil per day, and the second well on these premises should produce twenty-five barrels of oil per day, for thirty days after completion then second party shall pay to the first party seven hundred and fifty dollars, making the additional contingent bonus not to exceed twelve hundred and fifty dollars. And it is further agreed that the second party, his heirs or assigns shall have the right at any time to surrender up this lease and be released from all moneys due, and conditions unfulfilled, then and from that time this lease and agreement shall be null and void, and no longer binding on either party, and the payments which shall have been made be held by the party of the first part as the full stipulated damages for the non-fulfillment of the foregoing contract.

In witness whereof, the parties hereto have hereunto set their hands and seals this 25th day of January, A. D. 1896.

THOMAS B. HARNESS, [Seal]
ANNIE K. HARNESS, [Seal]
M. FINNEGAN. [Seal]"

"Witness: R. W. WALLACE."

Which was duly acknowledged and recorded.   By a writing dated February 4, 1896, duly acknowledged and recorded, M. Finnegan, in consideration of nine hundred and thirty-seven

dollars and fifty cents, assigned, transferred and set over to the
Eastern Oil Company, its successors and assigns an undivided
three-fourths part of said lease, and by another writing dated
January 1, 1898, acknowledged and recorded, said M. Finnegan,
in consideration of two thousand and fifty dollars paid, trans-
ferred and assigned to Charles O. Amsler, among other leases,
his remaining undivided one-fourth interest in said Harness
lease, "together with all wells, casing, rigs, tanks, pipe connec-
tions and anything thereto belonging, subject however, to all the
terms, conditions, royalties, rents and payments as far as the
one-fourth (¼) interest is concerned, in said leases contained,
reserved and provided, to be observed, performed and paid by the
lessees therein." The lessees entered into possession under the
lease, and drilled two wells, one being a strong gas well and
producing a small quantity of oil, but not sufficient quantity to
make any further bonus payable to the lessors under the terms
of the lease. The lessors paid the gas rental of sixty-two dol-
lars and fifty cents per quarter, and it is stipulated and agreed
in the record as a fact to which proof was waived, that the sum
of one thousand two hundred and fifty dollars bonus mentioned
in the lease of January, 1896, was paid in fact, and further that
the quarterly installments for rental for gas from the Harness
well No. 1, being sixty-two dollars and fifty cents each quarter
had been paid in full up to that time (March 27, 1900), and
that no such gas rentals were in default. At the June rules,
1899, of the circuit court of Pleasants County, Thomas B. Har-
ness and Anna K. Harness, filed their bill against the Eastern
Oil Company, a corporation, and M. Finnegan, alleging the frau-
dulent assignment of a part of said lease by Finnegan to the
Eastern Oil Co., that the Eastern Oil Co. was operating exten-
sively on a property adjacent to the leased premises and was
using the gas from the well No. 1 on leased premises in the
pumping and production of oil on the adjacent premises, and
failed to test first well, which was a gas well and sprayed some
five barrels of oil per day, and abandoned the second well and
thereby forfeited their lease; that plaintiffs' premises, or the
greater part thereof, was very valuable for oil, if properly devel-
oped would produce oil in paying quantities, but the premises
were being drained by developments on contiguous and adjoin-
ing properties; that defendants made no attempts to develop
the thirty-five and one-half acre tract and that the lease as to

that was absolutely forfeited, and that the lease was a cloud on
plaintiffs' title that should be removed by decree of the court;
that defendants were not protecting the lines of the leased prem-
ises and prayed for the cancellation of said leases as to both
tracts of thirty-five and one-half and one hundred and fifty-two
acres as a cloud upon plaintiffs' title; that a special receiver be
appointed with direction to take immediate possession of the
premises and protect the lines and make such developments as
the court shall deem necessary; that defendants be enjoined
from any trespass or developments on said premises and for gen-
eral relief.

Defendant Eastern Oil Company demurred to the bill,
and filed its answer, denying any construction of the lease incon-
sistent with its terms, and the improper or fraudulent assign-
ment of a part of the lease by Finnegan to the Eastern Oil Com-
pany, and refer to the sworn answer of plaintiffs in the case of
*Bettman* v. *Harness,* decided in this Court in November, 1896,
where the plaintiffs join with Finnegan and the Eastern Oil Co.
in maintaining the said assignment of Finnegan to said Com-
pany. Alleging that Finnegan had assigned his remaining one-
fourth interest to Charles Amsler and that Finnegan had no fur-
ther interest in the lease; admitting and charging that it had
put down two wells on the one hundred and fifty-two acres, that
it was done in connection with said Finnegan, that gas was ob-
tained in paying quantities in the Berea grit sand in the first
well, and that the well sprayed at the start some five barrels of
oil per day, but denied that it could have been made a pro-
ducer of oil or gas in the Cow run sand, and denies that it was a
producer of gas in the big Injun said; charges that it made a
show of oil in the Cow run sand, and that nothing was found in
the big Injun sand except salt water; that the most advantageous
use both to the lessors and lessee of the first well was to case off
liquids, from the big Injun sand, and to use the gas from the
Berea grit, at the same time preserving what oil could be pro-
duced from the Berea, which was done after the well had been
fairly tested, and that from the time the well was completed in
the spring of 1896, until the present time oil had been produced
as well as gas from that well, one-eighth of the oil had been
delivered to and received by said Thomas B. Harness and Anna
K. Harness, and respondent had further used the gas from that
well off the premises, and had regularly and promptly paid in

quarterly installments the sum of two hundred and fifty dollars per year for such gas, and gas and oil were both at that time being produced from that well; that respondent drilled and completed a second well with said Finnegan, but failed to find oil in paying quantities, that well was tested, but respondent was unable to get any production therefrom, except gas upon which respondent paid at the rate of two hundred and fifty dollars per year as long as the gas continued to flow. Respondent tested both said wells in order to obtain the best results, in which respondent was more interested than plaintiffs, and denied every statement in the bill to the contrary; that respondent was, in connection with said Amsler still producing both oil and gas from the well known as No. 1, and still had some casing in well No. 2, but denied anything had been done by it to avoid drilling on the property, or that any wrong towards plaintiffs had arisen under said lease. Denied operating on adjacent lands, except it drilled two wells on the Ross land, that the two drilled on plaintiffs' land offset them, being same distance from the line dividing the two properties, that one of the Ross wells at its maximum produced not over fifteen barrels per day and was then producing two barrels per day, that the other Ross well never produced more than five barrels per day, and at that time was producing about and not exceeding one barrel of oil per day; that respondent had seven wells of an aggregate of about thirty barrels per day about one-fourth mile from line of the Harness land, in no case being less than one thousand one hundred feet; denied that it had at any time abandoned the property or any part of it, or that it had forfeited any rights under its lease, or that the lease had expired, or that it had cased off any oil in either of the said wells or that it had abandoned any right acquired under said lease; that in connection with said Finnegan it bored two wells at the cost of drilling and equipping over eight thousand dollars, and the two hundred and fifty dollars per year gas rental paid by defendant was more than the benefit received from gas from the property, but had been paid along with royalty from oil in hope and expectation that some line or some indication might be given on the property justifying the expenditure of further sums in the development and production of oil; alleging that the territory is what is known in the oil business as "spotted," and while defendant believed probably that some oil existed in plaintiffs' land, had been unable to find same in paying quantities, and still engaged in

developments in that neighborhood, not close enough to drain plaintiffs' land which might show the probable direction of oil lines not then ascertained, and filed as exhibit a plat of plaintiffs' land and contiguous territory showing what it was doing; that respondent was engaged in no other business except production of oil and gas and employed only such agents and experts in their respective lines as were known to be competent for such business, charges that said one hundred and eighty-seven and one-half acres were leased as one tract, and denied that the lease was forfeited as to the thirty-five and one-half acres for non-development, but had several times proposed and stated to plaintiffs that it would at any time turn over and release the thirty-five and one-half acres if any person would in good faith drill a well on it and test it for oil, and again offered to do so, on condition that it should be drilled and thereby help to develop and demonstrate the value of the one hundred and fifty-two acres from which respondent was then producing oil and paying gas rent. Denied that it had made default in development of the property, and charged that it had fully protected the lines of the lands. Denied that there was any well in the neighborhood of plaintiffs' land that was draining it, or against which any wells needed to be drilled for protection of the lands, and denied there was any ground for appointment of a receiver to take away defendant's property to make developments thereon, and submits that if plaintiffs knew or if the court could in any manner ascertain where a well or wells should be bored on the leased premises, then a reasonable opportunity should be given to defendant to bore such wells and to produce oil therefrom before its rights under the lease are disturbed, and denies that its lease is any cloud upon plaintiffs' title or of that of either of them.

Plaintiff at April rules, 1900, filed an amended and supplemental bill, making Charles O. Amsler, P. Langton, P. J Langton and Eureka Pipe Line Co., a corporation, parties, making the original bill a part thereof, alleging that Eastern Oil Co. and Charles O. Amsler by contract in writing dated December 28, 1899, pretended to convey a one-half interest in said lease to P. and P. J. Langton, except in wells 1 and 2 already drilled on the premises, for whcih interest said Langtons were to begin at once and drill a well to completion on said premises, and to further develop the premises if it was found to be profitable territory, and exhibited said contract; that said matters of transfer

had come to plaintiffs' actual knowledge since the filing of the
original bill; that nothing was done by Eastern Oil Co. except as
alleged in original bill until long after the institution of the suit,
when it contrary to directions and express notice of plaintiffs,
undertook to put down a well on a portion of the land and pre-
tended it was dry, all of which actions were done against the
protest of plaintiff Thomas B. Harness, one whose portion of
land the said well was pretended to be put down; that subse-
quently under the agreement with Langtons they put down an-
other well on said plaintiffs' portion of land where Thomas B.
Harness always claimed oil could be found in paying quantities;
that said well was drilled against plaintiffs' express notice and
protest; that oil in paying quantities has been found in said last
mentioned well; demonstrating beyond question that the original
wells as alleged in plaintiffs' original bill were in fact paying, oil
producing wells, but were abandoned by the said company, which
abandonment worked a forfeiture of the entire lease for oil pur-
poses, that all the drilling last mentioned had been done by aid
Eastern Oil Co. long after defendant had forfeited the same,
and every part of it; alleging that the last clause in said lease
of January 26, 1896, in relation to the surrender of the lease by
the lessee at his pleasure, was not mentioned and that by that
provision after the cessation of payment of rental on said lease,
and after plaintiffs had ceased to receive rental, plaintiffs had the
right at any time to terminate the lease; that defendants had no
right to bore said last two wells, having had notice of the expira-
tion and forfeiture of said lease; that plaintiffs have always
since the date of their title to said land, and especially date of
said lease been in the peaceable and uninterrupted possession
of said premises, and entitled to the exclusive possession for all
purposes since the expiration of the two years in which defend-
ants had right to comply with the terms of the lease, and since
said two years expired defendants have been trespassers and said
lease constitutes a cloud upon their title, which in view of the
fact of plaintiffs' possession, they have a right to have removed
by a court of equity; that defendant's acts in extracting the oil
without authority is a destruction of the inheritance for which
there is no adequate remedy at law; that defendants were there
pumping said well and delivering the oil therefrom to the Eureka
Pipe Line Co., a common carrier of oil, defendants were getting
the benefit of the oil while plaintiffs were entitled to the whole of

it, and again alleges the necessity of a receiver, and prays for an injunction to restrain defendants from pumping, boring for or producing oil, the Pipe Line Co. from delivering them the oil, and that the lease be cancelled, set aside and annulled as a cloud upon the title of plaintiffs and for general relief.

All the defendants except the Eureka Pipe Line Company demurred to the amended and supplemental bill, and filed their answer thereto, adopting the answer of the Eastern Oil Co., to the original bill as far as the same was pertinent, and charge the same was true as of the time it was filed; admit the contract with the Langtons of December 28, 1899; that in September, 1899, they commenced a well on the one hundred and fifty-two acres and completed the same to and through the Cow run sand, that when completed it was absolutely dry and produced no oil or gas, said well marked No. 3, admit that a well had, within the then past sixty days, been completed under the contract with Langtons on the Harness land north of No. 1, and marked No. 4, that said well since about the 1st of March, 1900, had been and was then producing about twenty barrels of oil per day; one-eighth of which had been delivered into the pipe lines of the Eureka Pipe Line Co. to credit of plaintiffs according to terms of lease of January 26, 1896; deny that either No. 1 or No. 2 were oil producing wells except as to No. 1, the production of which had been regularly paid as to the royalty according to the terms of said lease; deny the abandonment of the lease or any right thereunder, but allege it to be in full force and effect, and had been fully complied with; aver that the lease was executed upon a bonus and actual payment of one thousand two hundred and fifty dollars, paid to plaintiffs and within a year from the date of lease some oil was produced in No. 1, the royalty of which had been regularly paid to plaintiffs. In addition to that the Eastern Oil Co. had paid two hundred and fifty dollars in quarterly installments from August, 1896, to that time to plaintiffs for the use of gas from that well, and that since about August, 1896, plaintiffs had received and used as fuel in their home and residence the free use of gas from well No. 1, and were still using it. Admits that wells 3 and 4 were drilled after this suit was commenced, and after said defendants were notified by Harness not to drill further on the premises, but submit that they or their assignees were entitled to drill said wells, and that said well No. 4, as well as No. 3, was drilled under the terms of the original lease, and

while the same was in full force and effect; that while some
formal expression of dissent was given by said T. B. Harness
against the drilling of said wells 3 and 4, in fact the minor son of
Harness, residing with his father and under his control, worked
upon the drilling of both of said wells Nos. 3 and 4, and that
Thomas B. Harness himself assisted in work necessary to the
drilling of No. 4. Respondents say the last clause of the lease
does not make the same voidable at the option of the plaintiffs;
deny that the lease expired in two years after its date, and
charge that gas and oil had been produced in paying quantities
from said premises and were yet being produced, and this had
resulted from the operations and expenditures made by the de-
fendants thereon; aver that twenty barrels of oil per day was then
being produced from the property and being delivered to the
Eureka Pipe Line Company, one-eighth to the credit of plaintiffs
and seven-eighths working interest to credit of lessees, to whom
it belonged; deny that plaintiffs were entitled to the whole pro-
duction; and deny that plaintiffs have any good cause or reason
to complain of defendants or any of them; allege the solvency of
all the defendants; that all the oil produced is being run
into the hands of the Eureka Pipe Line Co., which is a solvent
and responsible corporation; that the oils produced are being
regularly gauged and accurately measured and no part wasted,
and there is no cause for an injunction against defendants or for
a receiver of said property; admit that plaintiffs are in possession
of the premises, but subject to the terms of the lease of January,
1896, and that defendants are in possession of the premises and
have been for years, and operating the same in good faith and
paying to lessors everything that was agreed or required under
said lease, and deny all allegations of the several bills, except so
far as same are expressly admitted.

Depositions were taken and filed in the cause for plaintiffs and
defendants, and the cause submitted on the 20th of June, 1900,
on the bills, demurrers, answers and replications, the depositions
and exceptions to the depositions. On motion of plaintiffs the
suit was abated as to the Eureka Pipe Line Company. The
court overruled the demurrer as to the supplemental bill, and
was of the opinion and so decreed that as to all the territory em-
braced in the lease of January 25, 1896, said lease being a lease
for the purpose of development save and except as to wells Nos.
1, 4, 5 and well No. 6, said to be drilling in said lease, and a

reasonable acreage surrounding the same for the protection thereof had expired at the date of the institution of this suit, and was declared a cloud upon plaintiffs' title and removed as such, but as to wells 1, 4, 5 and 6, defendants were permitted to take the production thereof and use the premises as provided in said lease of January 25, 1896, subject to the rights of plaintiffs to receive their royalty in the oil and the payment for the gas as provided for in said lease, and enjoined defendants from any other operation upon the premises, except as aforesaid. From which decree the defendants Eastern Oil Co., Charles O. Amsler, P. J. Langton and P. Langton appealed, and say the court erred in overruling the demurrers; that plaintiffs neither averred nor proved any equity; that if plaintiffs had cause of action their remedy was at law; that it was error for the court to decree that the lease of January 25, 1896, had in any manner expired or become inoperative, either at the time of the commencement of the suit, or at the time of the rendition of the decree; that it was error to cancel the said deed of January 25, 1896, as to any portion of the territory embraced or covered thereby; it was error to hold or to decide that said lease had expired or ceased to operate, when the lessors at the very time of the decree were in the receipt of benefits under the lease according to its stipulated terms, and while gas was being found, furnished and paid for unto the lessors, and while oil was being found in paying quantities; that it was error to enjoin defendants from enjoyment of any part of the territory embraced in the said lease, and from operating the entire one hundred and eighty-seven and one-half acres set forth in said lease according to its terms, and that it was error to entertain the suit upon a mere ejectment bill.

The first and sixth assignments are to the same effect. Appellees insist that the lease should be cancelled in any event as to the thirty-five and one-half acres belonging to plaintiff Anna K. Harness, because it is conceded and defendants do not pretend that they have done anything whatever looking to the development of that tract. An inspection of the lease will show that the two tracts are leased as one tract of one hundred and eighty-seven and one-half acres jointly by the two owners, they were mentioned separately merely for convenience of description, then described as "containing one hundred and eighty seven and one-half acres, more or less, to have and to hold the above premises,"

etc. The royalty of one-eighth of all oil produced and saved from said premises was reserved to the "first parties" to be delivered in the pipe line with which the second party might connect their wells. The payments of the gas rentals were paid to and receipted for by the lessors jointly, and the oil royalty was run into the pipe line to their joint credit. The lease shows on its face to be a joint lease of a single tract, and the lessors and lessees have so treated it all the way through. Appellees rely largely upon *Bettman* v. *Harness,* 42 W. Va. 433, and *Steelsmith* v. *Gartlan,* 45 W. Va. 27, in support of their contentions. The leases in both those causes were different from this. In the former cause the same parties who are plaintiffs in this cause leased the same one hundred and eighty-seven and one-half acres in controversy here to Gilbert L. Watson "in consideration of the covenants and agreements hereinafter mentioned," granted, demised and let unto the party of the second part, his heirs and assigns for the purpose and with the exclusive right to explore for oil and gas, to lay pipes, etc., * * * to have and to hold the said premises for the said purpose only to the said lessees, etc., for the term of two years from the date of the lease, and as much longer as oil or gas is found in paying quantities, or the rental paid thereon, and in consideration of said grant the lessee was to deliver to the lessors in pipe lines one-eighth of the oil obtained from the premises and two hundred and fifty dollars for the gas from each well, so long as the same should be sold off the premises. Operations were to be commenced and a well completed within one month, and on failure to complete, lessee was to pay fifteen dollars per month in advance after the time for completing, which was to be received by lessors in full payment for such delay until the well should be completed. No operations were begun within the two years and it was properly held that lessee could not continue the lease after the end of the two years by the payment of fifteen dollars per month, the lease having ended with the two years. While in *Steelsmith* v. *Gartlan,* the lessor in consideration of one dollar and other valuable considerations granted to lessee all the oil and gas in and under the leased premises for the purpose and with the exclusive right of operating it for gas and oil with right of way, to lay pipes, etc., for term of five years and so much longer as oil and gas should be found in paying quantities, paying to the lessor one-eighth of all the oil produced and saved and two hundred dollars per year for the gas

which might be sold therefrom, lessee to complete a well within one month from date of lease in default of which the lease was to become null and void unless lessee should pay for further delay at the rate of fifty dollars per month in advance thereafter until a well should be completed. The lessee went into possession and drilled a well, completed it three months after the time for completion, paying and satisfying the lessor for the delay. The well completed was a "dry hole." Lessee removed his machinery and property from the leased premises and abandoned the lease, after drilling the well at large expense. Mrs. McGregor, the lessor having an opportunity to re-lease the premises notified the lessee several times of her desire and opportunity to lease to other parties, giving lessee the preference to devlop the property under his lease, but he still failing to do so, she leased to other parties, and it was held, syl. 1: "A lease for the purpose of operating for oil and gas for the period of five years, and so much longer as oil or gas is found in paying quantities, *on no other consideration than prospective oil royalty and gas rental,* vests no present title in the lessee except that the mere right of exploration; but the title thereto, both as to the period of five years and the time thereafter remains inchoate and contingent on the finding, under the explorations provided for in such lease, oil and gas in paying quantities." And it was further held, syl 2: "The completion of a non-productive well, though at great expense, vests no title in the lessee," and syl. 3: "Such lease must be construed as a whole, and if there is no provision therein contained requiring the boring of another well after the first unsuccessful attempt is completed and abandoned, the lease becomes invalid, and of no binding force as to any of its provisions." The lease in the case in hand is on a very different footing from either of those just mentioned. Here the lessee paid in cash for the oil and gas on the premises, one thousand two hundred and fifty dollars—being six dollars and sixty-six cents per acre for the whole leased premises, one hundred and eighty-seven and one-half acres, and proceeded to drill and complete a well in a short time after the time it was to be completed under the contract, the lessee paying and satisfying the lessors for the time of delay as provided in the contract. The well proved to be a good gas well, which furnished lessors heat and light for domestic purposes and being used off the premises the lessees paid the lessors two hundred and fifty dollars per annum in quarterly installments. Said

well also furnished some oil, which has been pumped and saved from the completion of the well, to the present which was run into the pipe lines, one-eighth to the credit of lessors. Another well was also drilled before the completion of said producing well, which proved a failure, furnishing neither gas nor oil in paying quantities, except a little gas for a short time which was used to complete the well No. 1, which has always been operated since its completion, paying the lessors as before stated two hundred and fifty dollars a year for the gas, and their one-eighth of the oil, besides gas for their home purposes, gas rental was paid on well No. 2 some forty days until it ceased to flow. In the fall of 1899, defendants drilled another well designated No. 3, which T. B. Harness says was finished about October 21, 1899, upon which well the minor son of T. B. and Anna K. Harness, who lived with his parents, worked, and which T. B. Harness says he served notice on the defendants to "shoot the well and put it to pumping." He further says that No. 4 was drilled into the sand on the 17th day of February, 1900, and No. 5 drilled in on April 26, 1900; that No. 4 was put to pumping March 1, 1900. When well No. 4 was being bored, notwithstanding Harness notified lessees not to bore, his minor son, Robert Harness, worked on the well as one of the tool dressers, and the father Thomas B. Harness was present much of the time. P. H. Langton, a witness, and one of the contractors for drilling the well, says, "He was there most of the time, for curiosity, I suppose." "State whether or not he took a hand in matters at all." "Yes, sir, he did directly and indirectly. He helped us one day to put a smoke stack together directly, and furnished us a monkey-wrench to fix an engine one night." 4 Am. and Eng. Dec. 349. "One who receives the benefit of a contract cannot deny that he made it or assert its invalidity, whether on the ground that it was *ultra vires*, or that it was made by an unauthorized agent, or that it was not executed as required by law, nor on any other ground," and cases there cited. The territory embraced in the lease in this case is clearly shown to be what is known as "spotted territory." Well No. 1 proved to be a good gas well, and furnished constantly a little oil, which was pumped and saved; the plaintiffs (the lessors) believing it to be good oil territory were exceedingly anxious to have it developed, and nothing is more natural than that they should be, and this accounts for the interest taken by Harness in the drilling of wells three and four on his

land, and that although he had notified lessees not to drill, yet he wanted his territory developed, and took part in the drilling and completion of the wells, by notifying them to "shoot No. 3 and put it to pumping," as stated by him, and was present assisting with No. 4, which came in a twenty barrel well, and continued a good producer, one-eighth of the product being run into the pipe line to credit of T. B. and Anna K. Harness, and the oil here began to flow into the pipe line so freely that the old gentleman concluded it would pay him better and be more satisfactory if he could receive not only the one-eighth but the eighteighth as it was being pumped from wells four, five and six. The most unaccountable feature of it is that he would ask to enjoin the lessees from multiplying wells for his use, as it is a costly proceeding to drill an oil well. The lessees having like territory on the Ross lease adjoining this were at the same time testing its value as an oil field, and the evidence shows that neither was given a special preference over the other by the lessees. The two wells, one and two, on the Harness, were equidistant from the division line with wells five and seven on the Ross lease, drilled about the same time. No. 5 for the first thirty days made thirteen barrels and No. 7 about three barrels, and had decreased to two and one barrels per day respectively, and No. 10 well on the Ross lease, about eight hundred feet from the line at its best about five barrels a day, had decreased to one barrel. These were the only wells that could at all probably interfere with the Harness interests, while "dry holes," dotted all around the Harness and the Ross. Including other wells on the Ross one thousand one hundred and more feet away, thirty barrels a day in the aggregate was the most that was being taken, and only the three barrels from five and seven on the Ross which might possibly affect the Harness interests in any degree, and this was offset to some extent by the production from Harness No. 1, was all there could likely be on the drainage theory, upon which point plaintiffs utterly fail in proof. But was there any default under the conditions of the lease, which is for "term of two years and as much longer as oil *or gas* is found in paying quantities?" It is not only admitted but alleged in plaintiffs' bill that gas was found in paying quantities, and has been constantly produced and paid for as stipulated up to the time of and since bringing this suit two hundred fifty dollars per year in quarterly payments. The moment oil or gas was found and produced in pay-

ing quantities, title thereto vested in the lessee under the lease, which must be taken as a whole and construed together. It cannot be separated. Both oil and gas are produced from the same well. Both are drilled for at the same time in the same well, and the production of either in paying quantities preserves the lease. Suppose in well No. 1, oil in paying quantities had been produced, and no gas, do plaintiffs contend that the lease is forfeited for that reason? With the same propriety they could have brought their suit to remove the lease as a cloud upon their title because gas was not produced. Gas is just as distinctly an article of commerce and trade as is oil. And if lessees fail to reasonably develop the leased territory or fail to protect the lines of the premises by boring other wells to prevent drainage to the prejudice of lessors' rights, their remedy, as held in *Ammons* v. *So. Penn Oil Co.*, 35 S. E. R. 1004, "is not by way of forfeiture of lessees' right to bore or drill for oil on the land or any part of it, but by an action or proceeding for damages caused by said breach." *Colgin* v. *Oil Co.*, 194 Pa. St. 234; *Young* v. *Oil Co.*, *Id.* 243.

The appellees in bringing their suit evidently were relying upon *Klepner* v. *Lemon*, 176 Pa. St. 502, but after the institution of their suit, and about the time it was heard, the cases of *Colgin* v. *Oil Co.*, and *Young* v. *Oil Co.*, *supra*, were decided, holding that under the decision in the *Klepner-Lemon* case the court only had equity jurisdiction because of the fraud on the part of the lessee, who had oil and gas leases on adjoining properties, upon which he had put down wells near the boundaries of plaintiff's land with the express purpose of securing the oil under plaintiffs' lands through these wells, in which case the lessee was required to drill another well to protect the lines of the lessor in default of which the leasehold estate should be deemed to be abandoned except as to the well actually drilled on plaintiff's land, and a certain specified space around it. In that case Judge Mitchell dissented, and in his dissenting opinion said: "I would reverse this judgment as a flagrant violation of the liberty and sanctity of contracts by raising a purely factitious equity to enable the complainant now to make a better bargain at the defendant's expense than he chose or was able to make for himself at the time." The cases of *Colgan and Young*, 194 Pa. St., virtually overrule *Klepner and Lemon*. In case at bar, there is an attempt to have their claim for relief on fraud in order to give the court

jurisdiction. The first charge of fraud in the bill is the assignment by Finnegan of an interest in the lease to the Eastern Oil Company, contrary to an alleged oral agreement on the part of Finnegan at the time of taking the lease not to so assign it; the answer to that is that there is nothing in the lease to that effect, and there is in it authority by plain implication to assign it, being made to Finnegan, his heirs and assigns, and no parol evidence can be introduced to vary the terms of a written contract. *Glass Co.* v. *Friedlander,* 84 Wis. 53; *Irwin* v. *Irwin,* (Pa.) 29 L. R. A. 292; *Landers* v. *Cooper,* 115 N. Y. 279, (5 L. R. A. 638) 5 L. R. A. 677; *Tuttle* v. *Burgett,* (O. St.) 30 L. R. A. 214. Their further charge of fraud is the wilful destruction of wells by the shutting off oil by casing when it was found in paying quantities. This is both unreasonable and improbable, that men spending large sums of money in search of oil when they find it, should smother it and shut it off when it is the very thing they are seeking at large expense. The only evidence we have of this, is that of Thomas B. Harness, who doubtless believed that his land was underlaid with a sea of oil, and all that was necessary was to bore a hole and pump it up. Others speak of a little show of oil in the course of the work of drilling, which lesees admit they had, but he is the only one who found it in large quantities. He was not a pracitcal oil man, and knew nothing about the business, and on this matter he is contradicted by all the operators whose interest in getting large quantities of oil was even much greater than that of Harness, they all stating unequivocally that everything possible was done to make the wells productive, and that the interests of the lessees would be subserved by the production of the oil in large quantities, and one of the strongest witnesses on this point is Finnegan, who at the time of testifying had no interest in the matter whatever. As stated in the answer of defendent Eastern Oil Co. by its vice president, Howard A. Forman, to the original bill, the territory was "spotted," and while the gas rental paid of two hundred and fifty dollars per year was more than the benefit received from the gas from the property, but the same had been paid along with the royalty from oil in the hope and expectation that some line or some indication might be given on the property justifying the expenditure of further sums in the development and production of oil, and for that purpose was still engaged in developments in that neighborhood not close enough to drain plaintiffs' land, which

might show the probable direction of oil lines not then ascertained. In *Colgan* v. *Oil Co.,* 194 Pa. St., it is held that "A court of equity will not assume jurisdiction to enforce specifically covenants in an oil and gas lease which are merely implied, and whose extent depends altogether on oral evidence of opinions, unless it appear that the lessee is fraudulently evading his obligations to the lessor," which case, as well as that of *Young* v. *Oil Co.,* 194 Pa. St., is approved in *Ammon* v. *So. Penn Co.,* 35 S. E. R. 1004. But the principle of actual fraud shown which governed in the *Klepnar-Lemon Case,* the court giving the lessee a time in which to drill a well to further develop, could not apply here, because other wells were drilled, and good producers of oil before any decree was entered in the cause. It is clearly shown that defendants were acting in good faith, and had in no wise abandoned their lease, and the plaintiffs have not been defrauded out of any oil they were entitled to. The lessees at very large expense in addition to the first sum of one thousand two hundred and fifty dollars paid for the oil and gas have developed the lands of plaitniffs, who are now getting or are entitled to get the proceeds of several oil wells, which are being run into the pipe lines, and would be probably getting more, but for the injunction granted in the cause, as at least one or two other wells were being bored by lessees. The provision in the lease that in case the well being then drilled on the Angus farm should make twenty-five barrels a day for thirty days, then there should be an additional sum of seven hundred and fifty dollars paid to plaintiffs, and if the first well drilled on the Hamp farm should produce a like quantity, they should be paid five hundred dollars additional, and if the Angus well should produce less than twenty-five barrels per day and the second well drilled on the premises leased should produce twenty-five barrels per day, then they were to be paid seven hundred and fifty dollars was of no value to plaintiffs, as none of the wells mentioned came up to the quantity prescribed. Appellees insist that under the ruling of this Court in *Eclipse Oil Co.* v. *So. Penn Co.,* 34 S. E. R. 923, and *Cowan* v. *Iron Co.,* 3 S. E. R. 120, 83 Va. 347, by reason of the last clause of the lease, "And it is further agreed that the second party, his heirs or assigns shall have the right at any time to surrender up this lease and be released from all moneys due and conditions unfulfilled, then and from that time this lease and agreement shall be null and void, and no longer binding on either party, and the pay-

ments which shall have been made be held by the party of the first part as the full stipulated damages for the non-fulfillment of the foregoing contract," they had the right to terminate the lease for want of mutuality. The ruling in the *Eclipse Oil Co. Case* holds that "An executory gas and oil lease, which provides for its surrender at any time, without payment of rent or fulfillment of any of its covenants on the part of the lessee, creates a mere right of entry at will, which may be terminated by the lessor *at any time before it is executed by the lessee."* In that case the lessee had paid nothing, had done nothing and could not be made to do or pay anything and it was properly held to be voidable for want of mutuality, but it was only so until the lessor should void ot or until the lessee should begin work under it in good faith. The lessee having done nothing to carry out his agreement, not having entered upon the premises to develop the same, from the 11th day of May, 1897, the date of the lease, and having paid no consideration for the lease, on the 18th of June, 1898, the lessor leased the premises to another person, thereby terminating the lease. The case of *Cowan* v. *Iron Co.,* was a mining lease, the ore and minerals sold to the lessee, and the purchasers invested with the usual mining rights, which were enumerated, and were to pay fifteen cents per ton for the ore as it was removed. They entered upon the premises and removd some two hundred tons and paid for it, and then abandoned the lease, removing all their machinery and property, and refused to release or cancel the agreement, though they had abandoned the business, either with or without consideration and announced their claim and asserted their right to hold the agreement as a deed by which they had purchased the ore, under which they were under no binding obligation to operate nor to pay any consideration, until it should comport with their own views of their interest in the matter; that they did not propose to mine iron ore at a loss, nor would they allow others to operate this iron ore at a profit. The court held that the contract should be rescinded and cancelled. The principles of equity would not permit the lessees, without consideration, to hold the lease indefinitely for speculative purposes, to the prejudice of the interests of the lessor. Appellees here contend that under the lease "if oil in paying quantities had been found lessees would not have paid anything for the gas even though they used it off the premises." It is true they did not bind themselves to pay for gas un-

less it was used off the premises. The gas used in developing the leased premises was not to be paid for, but appellees for their purposes would construe the words "if gas only is found," to mean that if oil as well as gas was found in paying quantities, that lessees could use all the gas they chose off the premises, and not pay for it. No court of equity would so construe it. The lease is for gas as well as for oil. Gas is useful for purposes of development, and while being so used on the premises, it is for the benefit alike of the lessees and lessors, but the lease must be taken as a whole and construed together, and whatever might be found on the premises in the way of gas and oil, lessees would be required to pay for gas used off the premises. Appellees contend by way of cross error that the court erred in giving in the decree to defendants wells Nos. 4, 5 and 6, and a sufficient acreage around each for the protection thereof, and refusing to cancel the lease as to these wells. If the court erred in cancelling the lease, as I think it did, of course it follows that the cross assignment is not well taken.

For the reasons herein given, the decree will be reversed, and the bill dismissed.

*Reversed.*