**McCALLISTER et al. v. TEXAS CO.**
**(No. 9358.)**

(Court of Civil Appeals of Texas. Ft. Worth. June 12, 1920. On Motion for Rehearing, July 2, 1920.)

1. **Mines and minerals** ⬅️78(1)—**Acts constituting "beginning of operations for drilling well for oil."**

Where lessee selected the location of an oil well and hauled derrick timbers to the site, and selected and provided a water supply for drilling purposes, there was a "beginning of operations for the drilling of a well for oil" within the meaning of a lease requiring such operations to be begun within a certain time.

2. **Mines and minerals** ⬅️78(2)—**Oil lease held not to stipulate for a forfeiture.**

A paragraph in an oil lease, providing that "in case the grantee * * * should sink a well or shaft and discover either oil, gas or other minerals within the limits of time provided, then the conveyance should be in full force and effect for 20 years from the discovery of the product," held not to stipulate for a forfeiture, even by implication, but to refer to another paragraph of the lease, providing for forfeiture, but providing only that "operations for the drilling of a well for oil or gas" should be begun within a certain time.

3. **Mines and minerals** ⬅️78(2)—**Provision in oil lease against forfeiture of certain area held not to provide for forfeiture of other lands.**

A provision in an oil lease, "After a well is begun no further payments in respect to delay shall be due, and for every well drilled there shall in all events be secure from forfeiture an area of two hundred (200) feet square, with the well in the center, together with one hundred sixty (160) acres of land adjoining," held not to provide for a forfeiture of lands not within such limits, but to be used only to remove all possible doubt of the right of the lessee to hold such amount of ground with a well in the center, etc.

4. **Mines and minerals** ⬅️78(2)—**Purchaser of part of tract leased could not complain of failure to drill for oil after declaring forfeiture of lease as to his respective tract.**

One who purchased part of a tract of land leased for oil, and denied the lessee any further rights in the tract purchased, thus put himself in default, and was therefore in no position to complain of the failure of the lessee to drill on his part of the land.

5. **Mines and minerals** ⬅️78(2)—**Forfeiture of oil lease cannot be enforced by purchaser of part of land.**

Where owner of four tracts of land executed a lease to the four as an entirety, purchasers of two of the tracts could not divide the contract into separate parts, and enforce a forfeiture of the lease in part only while it was valid as to the remainder; the purchaser acquiring no better right than the vendor possessed.

Appeal from District Court, Stephens County; Harry Tom King, Judge.

Trespass to try title by Wesley McCallister and by C. E. Sikes, respectively, against the Texas Company, consolidated, and tried together. Judgment for defendant, and plaintiffs appeal. Reformed and affirmed.

Turner & Seaberry, of Eastland, for appellants.

A. S. Hardwicke and A. B. Flanary, both of Dallas, and T. J. Lawhon, of Houston, for appellee.

DUNKLIN, J. Wesley McCallister instituted a suit against the Texas Company, a private corporation, in the form of trespass to try title to recover 80 acres of land situated in Stephens county. Another suit of like character was instituted against the same defendant by C. E. Sikes to recover a tract of 135 acres in the same county. The two suits were consolidated and tried at the same time. The petition filed by plaintiff in each suit, in addition to being in the usual form of trespass to try title, also contained an attack upon an oil lease executed by John Black in favor of the defendant, the Texas Company, dated August 19, 1911. That lease covered four separate tracts of land, which aggregated 880 acres, and each of the plaintiffs purchased one of the tracts from Black after the execution of the lease. It was alleged by each of the plaintiffs that the lease had terminated, and all rights of the defendant thereunder were forfeited by reason of its noncompliance with its terms and conditions, and for that reason plaintiffs sought a cancellation thereof as a cloud upon their respective titles, and each plaintiff prayed for that relief and for title and possession of his respective tract. From a judgment in favor of the defendant in both suits, the plaintiffs have prosecuted this appeal.

The following is the lease in controversy:

"John Black to the Texas Company. This oil and mineral lease and contract between John Black, hereinafter styled grantor, whether one or more, and the Texas Company, Natural Gas Department (hereinafter styled grantee), witnesseth:

"That said grantor does hereby grant, bargain, sell and convey unto the said grantee all of the oil, gas, coal and other minerals in and under the lands herein described, together with the exclusive right of ingress and egress at all times for the purposes of drilling, mining, and operating for oil, gas, coal and other minerals, and for conducting all operations, and the erection of appliances and structures in regard thereto, and for laying all pipe line necessary for the production, mining, storing and transportation of oil, gas and other minerals (with privilege of renewing and removing all such structures at will), reserving and securing to the grantor, however, the royalties, payments, and other benefits and advantages hereinafter

⬅️For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

provided for, and it is agreed that the grantee shall have free use of oil, gas, water from said lands for all development and operations thereon; said lands being described as follows:

"In Stephens county, Texas, and being 880 acres of land, more or less, described as follows: 135 acres of land, the S. W. part of sec. No. 1, Blind Asylum land, in Stephens county, Texas, patented to W. J. Mills, assignee, on the 7th day of Jan., A. D. 1909, by patent No. 136, vol. 3, duly of record in Stephens county, Texas, Patent Records, Book B, page 220. (2) 80 acres of land in said county, being the N. ½ of the N. E. ¼, sec. No. 57, blk. No. 6, T. & P. Ry. Co. lands. (3) 160 acres, the S. W. ¼ of sec. No. 11, Lunatic Asylum land, in said county. (4) 80 acres of land the S. ½ of the N. W. ¼, sec. No. 12, Lunatic Asylum land, in said county. (5) 80 acres of land, the N. ½ of the S. W. ¼ of sec. No. 12, Lunatic Asylum land, in said county. (6) 80 acres of land, the N. W. ¼ of sec. No. 2, Lunatic Asylum land, in said county. (7) 265 acres, being all of T. E. & L. Co. Sur. No. 1416, in said county.

"Grantor herein warrants that above-described land is not a homestead and does not claim it as such.

"To have and to hold, all and singular the above-described premises, rights, properties, and privileges and all such as are hereinafter specified, unto the said grantee, and the heirs, successors and assigns of such, forever upon the following terms:

"(1) Considerations of this contract are as follows: (a) The sum of ten ($10.00) dollars payment whereof by the grantor is hereby acknowledged; (b) such other payments by the grantee, if any, as may be hereinafter provided for; (c) the royalties hereinafter specified; and (d) the expenditures by the grantee of such sums of money as may have been or may hereafter be made upon the above premises, or upon neighboring lands, planned for the development of mineral resources in such locality, and the payments and expenditures made or that may be made by grantee are considerations not only for the mineral in the lands aforesaid, but for all the other privileges granted herein.

"(2) The royalty above mentioned as to oil shall be a quantity equal to one-eighth of all produced and saved upon the premises, the same to be delivered at the well free of charge to the grantor, or to his credit, in the pipe line to which such wells may be connected.

"(3) The royalty for coal shall be 6¼ cents for every ton of the same that is mined and marketed, payable monthly.

"(4) The royalty for natural gas shall be $1,000.00 per annum for each well from which gas is used off the premises, the grantor to have the privilege at his own risk and cost to make connections and use gas free of charge for one dwelling on the premises.

"(5) The royalty for any other minerals discovered shall be one-tenth of the net proceeds arising therefrom while the same are being used off the premises.

"(6) Under penalty of forfeiture of the rights and estates hereby granted operations for the drilling of a well for oil or gas shall be begun within two years from the time of final execution and delivery of this contract, and if so forfeited, the rights and liabilities of both parties shall thereupon be ended.

"Forfeiture may, however, be saved by the grantee, and the vitality thereof be continued and maintained, notwithstanding operations be not begun within the proper time limit, provided only that for the privilege of delay in such beginning from time to time the grantee may pay as hereinafter provided twenty-two dollars per quarter, for a period of not exceeding seven years, from delivery hereof. Operations upon a well begun shall be prosecuted with diligence, unavoidable accidents and contingencies only excepted, and when a well is begun, it shall be sunk to a depth of 1,500 feet unless oil or gas be sooner developed in paying quantities, but a well which may be lost or spoiled may be continued at another location, and to be considered the same as the original.

"After a well is begun, no further payments, in respect to delay shall be due, and for every well drilled, there shall in all events be secured from forfeiture an area of 200 feet square, with the well in the center, together with 160 acres of land adjoining, said acreage to be precisely designated by the grantee, if the grantor so demands.

"It is expressly agreed, however, that, notwithstanding the provisions of section 6, that considering the fact that this contract is one of several between the grantee and different parties applying to lands in the same locality, and it being the desire of all concerned to develop the mineral possibilities of such locality if the drilling of a neighborhood well shall be begun by said grantee within two years from final execution and delivery hereof, the time limits and other obligations defined in section 6, shall be so extended as that duty under the same shall not arise either as to drilling or payment until one year from the completion of such neighborhood well.

"(7) Any payments due or to become due hereunder shall be deemed complete if made or tendered to the grantor, or if deposited or tendered, to be deposited in the First National Bank at Breckenridge, Texas.

"(8) In case the grantee or successors or assigns of such should sink a well or shaft, and discover either oil, gas or other minerals within the limits of time, or the extension of such, as herein provided for, then this conveyance shall be in full force and effect for twenty years from the discovery of said product, and as much longer as such minerals are produced in paying quantities.

"(9) No well shall be drilled nearer than 200 feet of the house or barn now on said premises, unless by consent of both parties, it is agreed that the grantor is to have the exclusive use of the premises hereinbefore described for all purposes other than above mentioned. When requested grantee agrees to bury all pipe lines below plow depth, and pay all damages caused to growing crops and fences, when injured by grantee or by employés of such.

"(10) This lease is not intended as a mere franchise, but is intended as a conveyance of the property and privileges above described for

the purpose herein mentioned, and it is so understood by all parties hereto.

"(11) It is agreed that this contract and all the terms hereof shall extend to and be binding upon the successors, legal representatives and assigns, and successive assigns, of such parties, respectively. Executed this 19 day of August, 1911.  John Black."

It thus appears that the seven-year period, during which the lessee by the payment of rentals could defer operation for the drilling of a well expired August 19, 1918. Uncontroverted proof was made, as was also admitted in plaintiffs' pleadings, that the rentals stipulated in the lease were all paid for that 7-year period. The proof also showed that on July 13, 1918, a little more than one month prior to the expiration of the 7-year period, the Texas Company began operations for the drilling of a well on one of the tracts covered by the lease, and after such beginning, drilling operations were prosecuted with due diligence until the well was completed on May 13, 1919, at which time oil was found, and between the date of its completion and October 18, 1919, that well produced 754 barrels of oil. The drilling of that well cost the defendant company the sum of $50,000. While drilling operations began on July 13, 1918, the actual drilling of the well did not begin until September 14, 1918. Drilling operations beginning on July 13th consisted of the selection and location on that date of a place at which to drill, after the same had been designated by the company's division engineer, in obedience to instructions from the defendant, given on July 10. 1918; and as soon as the drilling site was selected, and during the month of July defendant hauled derrick timbers to the site selected, and provided a water supply for drilling purposes; and such operations were continued with diligence until the drilling of the well was actually begun and until the well was finished.

The judgment complained of followed verdicts of the jury in the defendant's favor, which were returned in obedience to a peremptory instruction by the trial judge.

There can be no doubt that the life of the lease was dependent upon the performance by the lessee of the conditions expressed therein relative to drilling an oil well, and it is admitted by the plaintiffs that time was of the essence of those conditions. Appellants insist that since oil was not discovered on the leased premises until after the expiration of the 7-year period, the lease was terminated under the provisions of paragraph 8 of the lease, read in connection with paragraph 6. Whether or not that contention is correct is the principal question presented for our determination.

Many authorities are cited by both parties, announcing familiar rules for the construction of written contracts:

"One of the primary rules of construction is, that the entire instrument must be taken and considered together. If the instrument, when thus considered, is susceptible of a reasonable construction, by which all its provisions are made to harmonize, and by which full effect is given to its various parts, then that will be considered the correct interpretation." Hearne v. Gillett, 62 Tex. 26.

"In construing the contract, each of its provisions must be considered in connection with the others, and, if possible, effect must be given to all. A construction which entirely neutralizes one provision should not be adopted if the contract is susceptible of another, which gives effect to all of its provisions." McKay v. Barnett, 21 Utah, 239, 60 Pac. 1101, 50 L. R. A. 371.

"Effect will be given to every part of the instrument if possible, since it is not presumed that the parties intended that there should exist in the contract inconsistent provisions." Elliott on Contracts, § 1526.

"The words of a contract will be given a reasonable construction, where that is possible, rather than an unreasonable one, and the court will likewise endeavor to give a construction most equitable to the parties, and which will not give one of them an unfair or unreasonable advantage over the other. Thus where the meaning is doubtful the construction will be avoided which will entail a forfeiture." 9 Cyc. 587.

"Forfeitures are not favored by the law, and, if the language used is fairly susceptible of an interpretation which will prevent a forfeiture, it will be so construed." Brown v. Insurance Co., 89 Tex. 595, 35 S. W. 1061.

In the case of Decker v. Kirlicks, 216 S. W. 385, Chief Justice Phillips, speaking for our Supreme Court, said:

"If the provision is ambiguous, that alone condemns it as a forfeiture provision. A forfeiture should rest upon surer ground. Where a contract is so vague in its terms that a court cannot determine its meaning, it would be unjust to enforce a forfeiture under it against one whose only fault has been to possibly mistake its meaning. Forfeitures are harsh and punitive in their operation. They are not favored by the law, and ought not to be. The authority to forfeit a vested right or estate should not rest in provisions whose meaning is uncertain and obscure. It should be found only in language which is plain and clear, whose unequivocal character may render its exercise fair and rightful."

[1] The acts done and performed by the lessee within the seven-year period from the date of the lease, mentioned above, constituted a beginning of "operations for the drilling of a well for oil" within the meaning of paragraph 6 of the lease. Fleming v. S. Penn Oil Co., 37 W. Va. 645, 17 S. E. 204; Henderson v. Ferrell, 183 Pa. 547, 38 Atl. 1018. In paragraph 6 of the lease contract, it is clearly and plainly stated that a forfeiture of the lease might be prevented by beginning "operations for the drilling of a well for oil

and gas" within the 2-year period from the date of the execution and delivery of the contract; and that, notwithstanding such operations be not begun within that period of time, forfeiture might still be saved by payment of the rentals at the rate of $22 per quarter for a period not exceeding 7 years from the delivery of the lease, such rentals to be paid for the privilege of delay in the beginning of such operations for drilling; and it was further provided that when such operations should be begun they "shall be prosecuted with diligence, unavoidable accidents and contingencies only excepted." It is further provided that "after a well is begun no further payments in respect to delay shall be due."

From this paragraph of the contract, it is clear that if drilling operations were begun within the 7-year period mentioned, and thereafter prosecuted with diligence, there could be no forfeiture of the lease, even though oil should not be discovered within the 7-year period; in other words, the time for the sinking of a well and the discovery of oil after the beginning of drilling operations was limited only by the period required for the completion of a well by the exercise of reasonable diligence, which actually occurred on May 13, 1919. That paragraph of the contract contains the only provision specifically stipulating for a forfeiture of the lease, and the conditions or contingencies for which a forfeiture might be declared. And as the proof shows without controversy that operations for drilling were begun within the 7-year period from the date of the lease, it cannot reasonably be contended that tested by the provisions of paragraph 6 standing alone, there was a forfeiture.

[2] If paragraph 8 of the lease provides for a forfeiture at all, then the most that can be said is that it does so by implication only. We do not think it stipulates for a forfeiture at all, even by implication. Evidently it refers to the provisions of paragraph 6, and provides for an extension of the lease for 20 years after the discovery of oil, and as much longer as the same may be produced in paying quantities. That paragraph contains the only provision of such extension of the lease.

We are of the opinion that the time given by paragraph 6 for the completion of a well was clearly within the contemplation of the parties in the use of the language contained in paragraph 8 "within the limits of time or the extension of such as is herein provided for." Nabors v. Producers' Oil Co., 140 La. 985, 74 South. 527, L. R. A. 1917D, 1115; Fisher v. Crescent Oil Co., 178 S. W. 905; Pressed Steel Car Co. v. Ry. Co., 121 Fed. 609, 57 C. C. A. 635; Brown v. Fowler, 65 Ohio St. 507, 63 N. E. 76.

The well drilled by the lessee was upon another and different tract of land from those owned by the plaintiffs, and appellants insist that the lease as to their two tracts was forfeited by reason of the failure of the lessee to begin a well or the operations for drilling on those two tracts. They invoke the following provisions of paragraph 6 of the lease:

"After a well is begun, no further payments in respect to delay shall be due, and for every well drilled there shall in all events be secure from forfeiture an area of two hundred (200) feet square, with the well in the center, together with one hundred sixty (160) acres of land adjoining, such acreage to be precisely designated by the grantee if the grantor so demands."

[3, 4] As pointed out already, the preceding provisions of paragraph 6 contained the only specific stipulations for a forfeiture, and according to those stipulations the drilling of only one well was required. The stipulation last quoted does not specifically provide for a forfeiture of any part of the lease. The reference therein to a forfeiture is exceedingly vague and uncertain, and if a forfeiture was intended for any part of the lease, such intention could be by implication only. The language of the provision last quoted evidently has reference to preceding portions of the same paragraph of the contract, in which the drilling of only one well was required to save a forfeiture of the entire lease, and we think it clear that the purpose of the parties in adding to paragraph 6 of the language last quoted was to remove all possible doubt of the right of the lessee to hold 200 feet square with a well in the center and 160 acres of land adjoining the same around each well drilled. Furthermore, the evidence shows that the plaintiffs both declared a forfeiture of the lease as to their respective tracts immediately after the expiration of the 7-year period stipulated in the lease, and denied the lessee any further rights in those two tracts. They thus put themselves in default, and were thereafter in no position to complain of the failure of the lessee to drill upon their respective tracts. In Consumers' Gas Trust Co. v. Worth, 163 Ind. 141, 71 N. E. 489, the Supreme Court of Indiana, in discussing a similar contention, used this language:

"As to whether appellant should have commenced operations between March 3, 1902, and the day on which this action was commenced, is, under the circumstances, not a question in the case, for certainly appellee, after notifying appellant company that the contract was at an end, was not in a position to insist or expect appellant to expend money in drilling wells and developing the lands under a contract which she had declared to be forfeited."

To the same effect are the following decisions: Weaver Mining Co. v. Guthrie, 189 Mo. App. 108, 175 S. W. 118; Leonard v. Busch, 139 La. 1099, 72 South. 749, and authorities there cited.

[5] The observation last made applies also

to the further contention of appellants that the court should have submitted to the jury the question whether or not the lessee used due diligence for the further development of the 880 acres covered by the lease after the completion of the well drilled on May 13, 1919. And we think it proper to add that the lease executed by John Black was to the four tracts, aggregating 880 acres as an entirety, and, plaintiffs having purchased two of the tracts, could not divide that contract into separate parts and enforce a forfeiture of the lease in part only while it was valid as to the remainder. John Black, their vendor, had no such right, and the plaintiffs acquired no better right than he possessed. Fisher v. Crescent Oil Co., 178 S. W. 905; South Penn. Oil Co. v. Snodgrass, 71 W. Va. 438, 76 S. E. 963, 43 L. R. A. (N. S.) 848; Harness v. Eastern Oil Co., 49 W. Va. 232, 38 S. E. 663; Cochran v. Gulf Refining Co., 139 La. 1010, 72 South. 721; Nabors v. McCormick, 145 La. 88, 81 South. 766.

For the reasons noted, all of appellants' assignments of error are overruled.

The issue of title to the lands was made by the pleadings, as well as the issue whether or not the lease has been forfeited. The judgment of the court was, in general terms that plaintiffs take nothing of defendant, and that defendant go hence without day and recover its costs. The legal effect of that judgment upon its face would be a decree of title to the land in the defendant. But it is apparent that the real and only controversy in fact was whether or not there had been a forfeiture of the lease, and the judgment of the trial court will be so reformed as to limit its effect simply to a denial of plaintiffs' suit to cancel the lease, and a decree that the same is valid and subsisting as to the lands owned by plaintiffs. This correction of the judgment has not been suggested by appellants, but we think it proper, in justice to them. And as so reformed, the judgment of the trial court will be affirmed.

### On Motion for Rehearing.

Appellants urgently insist that we discuss the authorities relied on by them in their briefs filed, and complain of our failure to do so in our opinion on original hearing. In the case of Texas Co. v. Daugherty, 107 Tex. 226, 176 S. W. 717, L. R. A. 1917F, 989, a lease, which in terms was similar to the one in controversy in this suit, was held to be a conveyance of an interest in the land, with a condition of defeasance subsequent for the nonperformance of which the title might revert to the grantor. Many other decisions are cited by appellants which follow that decision in principle, such as Pierce-Fordyce Oil Association v. Woodrum, 188 S. W. 245. And appellants quoted the following from Simkins on Contracts, pp. 593, 594:

"A condition subsequent operates on an estate already created and vested, which, if not performed, the estate may be defeated by the re-entry of the grantor. * * * When the matters breached are shown by the contract to be vital to its existence, that is, goes to the root of the contract, so that failure would destroy its purpose and object, then the breach would release the promises. * * * Again, it applies in all cases where time is of the essence of the contract, and there is a failure to act within the time as limited."

Appellants insist that the instrument in controversy was a conveyance of the minerals underlying the land, upon a condition subsequent expressed in paragraph 8, which condition, they allege, was never performed by the lessee within the time fixed in that paragraph, and that, since such time limit was of the essence of the contract, the title conveyed by the instrument terminated and reverted to the grantors.

In the case of Grubb v. McAfee, 212 S. W. 464, the lease in controversy was canceled on the ground that the facts showed an abandonment by the lessee. And several other decisions have been cited, such as Fisher v. Crescent Oil Co., 178 S. W. 905; Munsey v. Marnett Oil & Gas Co., 199 S. W. 686, which recognize the rule that an oil lease may be canceled for abandonment by the lessee.

In Weiss v. Claborn, 219 S. W. 884, this court held that the general rule that a court of equity will never lend its aid to enforce a forfeiture did not apply to that case, which was a suit to cancel an oil and gas lease by reason of the failure of the lessee to exercise the option given him to continue it in force by performance of the conditions therein stated.

As shown in our opinion on original hearing, we held that time was of the essence of the conditions to be performed by the lessee, in order to keep alive the lease, and recognized the soundness of the proposition that, unless those conditions were performed within the limits of time so fixed, all rights of the lessee were lost. In view of that conclusion, to which we still adhere, we deemed it unnecessary to determine whether or not the instrument executed by John Black conveyed title to the minerals upon conditions subsequent, or was a mere optional lease of the mineral rights upon the same conditions, since in either contingency a failure to perform the conditions would give Black, the grantor, and his assignees the right to have the lease canceled.

As shown in our original opinion, drilling operations were begun before the expiration of the 7-year period mentioned in the lease, and after such beginning they were prosecuted with due diligence until the well was finished. If we were correct in our conclusion that paragraph 8 did not stipulate for a forfeiture in those circumstances, then the issue of aban-

donment prior to the completion of that well had no proper place in the discussion of the case, and for that reason the authorities bearing on that issue, and cited by appellants, were not referred to.

The equity rule invoked in Weiss v. Claborn, 219 S. W. 884, was not invoked by appellees in the present suit, and the conclusions we reached were not in conflict with that decision, but in strict accord with it. Hence we deemed it unnecessary to discuss that case. The lease in controversy here uses the expression, "Under penalty of forfeiture," and "forfeiture may be saved however," and we used the term "forfeiture" in the same sense, just as it was used by Chief Justice Phillips in Decker v. Kirlicks, 216 S. W. 385, cited in our original opinion, and as it is commonly used in suits for the cancellation of such leases. That term is given different interpretations in different circumstances, as shown by numerous authorities cited in Words and Phrases, vol. 2, pp. 611, 612.

We fully recognize the right of cancellation, if the conditions of the lease were not complied with within the time limits fixed by its terms. That was all that appellants contended for and insisted on. But for the reasons given in our original opinion, which it is unnecessary to repeat, we did not believe that the lessee failed to comply with the conditions of the lease within the limits of time stipulated. The question of the proper interpretation of the instrument itself was the pivotal and controlling issue in the case.

The motion for rehearing is overruled.