194     243
f216    ²366

## Andrew B. Young. *v*. Forest Oil Company et al., Appellants.

*Lease—Oil and gas lease—Equity—Specific performance—Sinking additional well—Multifariousness.*

Where a bill in equity to enforce covenants in an oil lease joins as defendants the original lessee and a large number of successive assignees of the lease, and no joint title, possession or liability is averred or shown, and all the alleged trespasses, defaults and breaches of covenant by the different assignees for a period of seven or eight years are pitched together into hotchpot, and each lessee made liable for the sum total, without regard to the statute of limitations, and whether the alleged injury was done before, or during, or after his interest or possession under the lease, the bill is demurrable for multifariousness and for want of equity.

Where a lessee under an oil and gas lease has entered upon land and sunk wells he is entitled, in determining whether he shall sink additional wells, to follow his own judgment. If that is exercised in good faith, a different opinion by the lessor, or the experts, or the court, or all combined, is of no consequence, and will not authorize a decree interfering with him.

A bill in equity will not lie by the lessor of an oil and gas lease against the lessee or his assigns, to compel the latter to test part of the leased land not yet drilled, or, upon his failure to do so, to surrender the land to the lessor, unless it is shown that the failure of the lessee to drill amounts to a fraud upon the rights of the lessor.

*Oil and gas lease—Termination of lease—" Found or produced in paying quantities."*

Where a lease is to continue as long as oil or gas is found or produced in paying quantities, the phrase, " found or produced in paying quantities," means paying quantities to the lessee or operator. If oil has not been found, and the prospects are not such that the lessee is willing to incur the expense of a well (or a second or subsequent well as the case may be), the stipulated condition for the termination of the lease has occurred. So, also, if oil has been found, but no longer pays the expenses of production. But if a well, being down, pays a profit, even a small one, over the operating expenses, it is producing in " paying quantities," though it may never repay its cost, and the operation as a whole may result in a loss. The phrase " paying quantities," therefore, is to be construed with reference to the operator, and by his judgment, when exercised in good faith.

Argued Nov. 6, 1899. Appeal, No. 184, Oct. T., 1899, by defendants, from decree of C. P. No. 2, Allegheny Co., Oct. T., 1898, No. 678, on bill in equity. Before STERRETT, C. J., GREEN, MCCOLLUM, MITCHELL, DEAN, FELL and BROWN, JJ. Reversed. DEAN, J., dissents.

Bill in equity for forfeiture of an oil lease or in the alternative for the specific performance of covenants contained in the lease, by sinking additional wells.

FRAZER, J., found the facts to be as follows :

1. On and before October 21, 1889, the plaintiff was the owner of fifty-three acres of land situate in Robinson township, Allegheny county, subject only to a dower interest of his mother, Mary Young, until her death, which occurred on January 7, 1892. On October 21, 1889, the plaintiff and his mother leased the said premises for oil and gas purposes to T. J. Vandergrift, the lessee, to hold the premises for and during the time herein limited and specified, and as much longer as gas or oil is found or produced in paying quantities, and the rental or royalty is paid as herein agreed upon, the lessee to pay an annual rent of $500 for each gas well of sufficient capacity to justify marketing its product, and deliver the plaintiff in tanks one sixth of all oil produced from the premises. It was further provided in the lease that all abandoned wells to be securely plugged by the lessee, " or (at the option of the first parties) be surrendered to the first parties for their sole and absolute use."

2. Numerous assignments of interest in said lease have been made since its execution by the Youngs to Vandergrift, the different owners and the time during which they held as shown by the transfers being as follows : T. J. Vandergrift, from October 21, 1889, to October 14, 1890; T. J. Vandergrift, Geo. H. Ahrens, H. W. Odell, Cyrus Underwood, G. W. Sill and T. E. Murphy from October 14, 1890, to October 21, 1891; Geo. H. Ahrens, H. W. Odell, G. W. Sill, S. S. Henne and J. A. Cadwallader from October 21, 1891, to January 16, 1896; Geo. H. Ahrens, G. W. Sill, S. S. Henne, J. A. Cadwallader and H. M. Cochran from January 16, 1896, to August 22, 1896; Geo. H. Ahrens, G. W. Sill, S. S. Henne, H. M. Cochran and M. A. W. Cadwallader from August 22, 1896, to August 28, 1897; Geo.

H. Ahrens, G. W. Sill, H. M. Cochran and S. S. Henne from August 28, 1897, to September 1, 1897 ; Geo. H. Ahrens, G. W. Sill, H. M. Cochran and II. W. Odell from September 1, 1897, to January 26, 1898, and the Forest Oil Company from January 26, 1898, to the present time.

3. Under the lease five wells have been drilled on the premises, known and designated respectively as Nos. 1, 2, 3, 4 and 5, No. 1 being located on the northwest corner of the farm 224 feet from Frank Schuler's line. This well was completed in 1890 and produced oil at an average rate of 150 barrels an hour for the first thirty days ; its output gradually decreased until January, 1891, when its production, after being cleaned out, was twenty-five barrels per day, and it has continued to decrease in production until at this time it is only producing one half barrel per day. Immediately after the completion of well No. 1, wells Nos. 2, 3 and 4 were drilled, and each produced oil for a time, and were abandoned in the latter part of 1892 on account of their small output, their production at the time of abandonment being as follows : Wells Nos. 2 and 3 each one fourth barrel daily, and well No. 4 one half barrel per day ; well No. 5 located 252 feet west of plaintiff's east line and nearly midway between his north and south lines was drilled in 1896 through both the 100 foot and fourth sands without obtaining either oil or gas.

4. The district in which plaintiff's farm is situated is known as the Forest Grove Oil Field, and in all wells drilled in that field oil is obtained from what is known as the 100 foot sand, except in one well known as the Sarah J. Phillips No. 3, in which the oil is obtained from what is known as fourth sand, this sand being found about          feet below the 100 foot ; the Phillips No. 3 is about 1,000 feet south of the southwest corner of plaintiff's farm, and about 2,000 feet southwest of his well No. 5.

5. Wells have been drilled on all farms adjoining the plaintiff's farm, and in every instance oil has been obtained except in the well known as Parsonage Oil Company No. 1, which is a gas well, and plaintiff's No. 5 well which produced neither oil nor gas ; the production of the wells on plaintiff's and adjoining farms from the discovery of oil in 1890 until June, 1899, is approximately as follows :

| A. B. Young | | farm | 4 | wells, | 150,000 | barrels. |
|---|---|---|---|---|---|---|
| McKown Heirs | | " | 4 | " | 135,000 | " |
| Eliza McElherron | | " | 5 | " | 44,000 | " |
| Sarah J. Phillips | | " | 4 | " | 52,000 | " |
| Frank Schuler | | " | 4 | " | 100,000 | " |
| Forest Grove church lot | | | 1 | " | 43,000 | " |
| A. M. & M. E. Young | farm | | 4 | " | 24,000 | " |

6. The defendant company, the present holder of the lease, has refused to drill additional wells on plaintiff's land, contending that this land has been sufficiently developed and that the probabilities of getting a well with a production sufficient to pay drilling and operating expenses and a reasonable profit are not sufficient to warrant the expense.

7. The land in the neighborhood of plaintiff's farm has been drilled as follows:

| A. B. Young | farm one well to every | $10\frac{3}{5}$ | acres |
|---|---|---|---|
| Jno. McKown's Heirs | " " " " " | .10 | " |
| Eliza McElherron | " " " " " | 11 | " |
| Jno. & Anna Young | " " " " " | 12 | " |
| Frank Schuler | " " " " " | $11\frac{5}{6}$ | " |
| Philip Magnus | " " " " " | $16\frac{2}{3}$ | " |
| Sarah J. Phillips | " " " " " | 17 | " |
| D. K. Ewing | " " " " " | 34 | " |
| Parsonage Lot | four wells to five acres | | |
| School house Lot | one well " " " | | |
| Church Lot | " " " three " | | |

8. The nature of the sand from which oil is produced determines the extent or the area which a well will drain. A well producing from a coarse and pebbly sand will drain from a greater distance than one producing from a hard and compact sand.

9. The sand from which oil is obtained in the Forest Grove Oil Field is of a loose coarse nature, and wells producing from that sand will draw for a distance of 500 feet.

10. The plaintiff can, were it not for the lease held by defendants, lease his said farm in its present condition for oil and gas purposes and have the east portion thereof tested by having drilled thereon one or more wells.

The court entered the alternative decree prayed for in the bill.

*Error assigned* was the decree of the court.

*J. McF. Carpenter,* with him *George J. Wolf* and *R. W. Cummins,* for appellants.—The demurrer should have been sustained; the action, so far as it relates to the Forest Oil Company, is an action of ejectment; the liability for damages, if any, is not joint, but several; the decree requiring additional drilling can operate only against the present tenant in possession, and the bill is palpably multifarious, both in respect to parties and purposes: Hoch v. Bass, 133 Pa. 328; Kitchen v. Smith, 101 Pa. 452; Duke v. Hague, 107 Pa. 57; Venture Oil Co. v. Fretts, 152 Pa. 451.

It may be said that equity will interfere to stay waste. This is true, but it will not interfere to oust a party who acquired an unquestioned legal right to enter and, pursuant thereto, entered and remains in possession, claiming title and right of possession: Warner v. Bennett, 31 Conn. 468.

A court of equity does not lend its aid to divest an estate for the breach of a condition subsequent: Livingston v. Tompkins, 4 Johns. Ch. 415; Copper Mining Co. v. Ormsby, 47 Vt. 713.

While the original lessee is liable on his contract for a breach occurring at any time, the assignee is only liable for a breach occurring during his tenancy: Bradford Oil Co. v. Blair, 113 Pa. 83; Washington Nat. Gas Co. v. Johnson, 123 Pa. 576.

The rule prevailing in equity is that to enable a lessor to declare and enforce a forfeiture, the right to do so must be distinctly reserved; the proof of the happening of the event upon which it is to be exercised must be clear; the right must be exercised promptly, and the result of enforcing the forfeiture must not be unconscionable: Thompson v. Christie, 138 Pa. 230.

*M. A. Woodward,* for appellee.—A maintenance of the grant, while ignoring, rejecting and defeating the very purpose of the grant, and the consideration upon which it is granted, is beyond question a perverse and fraudulent use of the same, and a condition of things wherein a court of equity alone has the power to give adequate and complete relief, and it is fully armed

to do so : Kleppner v. Lemon, 176 Pa. 502; McKnight v. Manu-
facturers' Natural Gas Co., 146 Pa. 185.

The bill is not multifarious : 1 Daniell's Chancery Pleading
and Practice, p. 334.

OPINION BY MR. JUSTICE MITCHELL, December 30, 1899:

This is a bill by the lessor of oil land to declare a forfeiture
of the lease for failure to develop the land and for damages for
draining it from wells on neighboring leaseholds, or in the alter-
native for a decree of specific performance of the implied cove-
nant, by sinking additional wells.   The jurisdiction in cases of
this kind is discussed in Colgan v. Forest Oil Company, opin-
ion filed herewith, ante, p. 234, and we need only say now that
it must be based and sustained on the ground of actual fraud.
The bill is a striking example of the danger of dragging a con-
troversy of this kind into a court of equity, where ordinarily it
has no proper place.   The bill joins as defendants the original
lessee, who had parted with all his title more than seven years
before bill filed, and all the successive assignees down to and
including the Forest Oil Company, appellant, the only one now
in possession or claiming title as lessee.   No joint title, posses-
sion or liability is averred or shown, and all the alleged tres-
passes, defaults and breaches of covenant by the different as-
signees of the lease for a period of seven or eight years are
pitched together into hotchpot, and each lessee made liable for
the sum total, without regard to the statute of limitations, and
whether the alleged injury was done before, or during, or after
his interest or possession under the lease.   As against the oil
company, the principal defendant, it is nothing more than an
ejectment bill for breach of covenant, and as to the other de-
fendants it is a personal action for damages.   It was demurred
to for multifariousness and for want of equity.   The demurrer
should have been sustained on both grounds.

But without reference to the form of the remedy the case is
wholly destitute of merit on the facts.   The learned judge be-
low found that " the west end of plaintiff's farm has been suffi-
ciently developed, but we do not think the one well No. 5 was
a sufficient test for the north and east portion of the farm,
especially as there was not a trace of oil or gas in it. . . . There
remains a large portion of plaintiff's farm which . . . . ought

to produce oil in paying quantities with a reasonable degree of certainty." And further, " in view of the foregoing findings we conclude that under the circumstances of this case, the defendant's refusal to sink additional wells on plaintiff's farm is a wrongful act, amounting to a fraudulent use of the lease to plaintiff's injury." It is manifest that this conclusion proceeds from an erroneous view of the law, probably due to a misapprehension of the scope of the case of Kleppner v. Lemon, 176 Pa. 502. That decision was not meant to stretch the jurisdiction of equity beyond its regular and established limits, nor to blaze out any new path for proceedings on oil or gas leases differing from ordinary remedies between lessor and lessee. It rested on fraud, alleged and proved, and fraud in fact, not merely inferred from a difference of judgment between the defendant and the court as to the profitable development of the leased premises. In the present case the conclusion of the court rests on nothing else than such difference of judgment. There is not a scintilla of evidence for any other basis. The lessee contracted to put down one paying well; he did in fact put down five, four of which produced oil for a time. Even considering the plaintiff's side alone, the weight of the evidence in favor of the court's conclusion is exceedingly light. Passing over the plaintiff's extraordinary reasoning that, because one well put down in the alleged insufficiently tested part of the farm, proved to be a dry hole, therefore another hole in the same portion would produce a paying well, we have looked in vain for any testimony that even the experts are willing to stake their judgments on any such result. Not a single witness says so. They say, and most of them on hypothetical questions, without personal acquaintance with the locality, that the indications are that it is " good oil territory." Mr. Carnahan, the witness best acquainted with the land, and apparently the most intelligent and competent expert examined, says " the chances are that the 100 foot sand " (the one from which all the oil has so far been produced) " is pretty well drained, but the 100 foot in all probability is not all the sand that is there." He therefore considered the property as having a value for development for the lower sand. But even he does not venture the opinion that it would be sound business judgment to spend $4,000 or $5,000 in sinking an additional well on the present prospects of its even repaying the

cost. Even if he and all the others had said so with sufficient positiveness to convince the court as a matter of judgment, it would not have been enough. The undisputed facts were that on the plaintiff's farm of fifty-three acres five wells had been sunk, being as favorable a showing (see judge's seventh finding of facts) in proportion of wells to acreage as much the greatest part of the surrounding territory. Four of the wells, however, were on or near the western portion of the farm, and only one on the other side, which proved dry. There was therefore a considerable intervening part of the farm on which no well had been sunk. The real question in the case was whether the omission to put a well in that portion of the land was fraudulent. There was not a scintilla of evidence to sustain any such conclusion, and without it there was nothing on which the bill could be supported. The operator, who has assumed the obligations of the lease, has put his money and labor into the undertaking, and is now called upon to determine whether it will pay to spend some thousands of dollars more in sinking another well to increase the production of the tract, is entitled to follow his own judgment. If that is exercised in good faith, a different opinion by the lessor, or the experts, or the court, or all combined, is of no consequence, and will not authorize a decree interfering with him.

The plaintiff claimed that the lease had expired because oil was no longer produced "in paying quantities." The learned judge, while not deeming it necessary to determine the exact meaning of this phrase, nevertheless refused to decree any relief on this ground. In this he was clearly right. The phrase, "found or produced in paying quantities," means paying quantities to the lessee or operator. If oil has not been found, and the prospects are not such that the lessee is willing to incur the expense of a well (or a second or subsequent well as the case may be), the stipulated condition for the termination of the lease has occurred. So, also, if oil has been found but no longer pays the expenses of production. But if a well, being down, pays a profit, even a small one, over the operating expenses, it is producing in "paying quantities," though it may never repay its cost, and the operation as a whole may result in a loss. Few wells except the very largest repay cost under a considerable time; many never do, but that is no reason why

the first loss should not be reduced by profits, however small, in continuing to operate. The phrase, "paying quantities," therefore is to be construed with reference to the operator, and by his judgment when exercised in good faith.

Decree reversed, and bill directed to be dismissed with costs.