### BARNSDALL v. BOLEY et al.

(Circuit Court, N. D. West Virginia. December 3, 1902.)

1. OIL LEASE—UNAUTHORIZED ALTERATION—WAIVER OF OBJECTION.

After the execution of an oil lease for the term of five years, covering a number of tracts of land, the lessee discovered that certain heirs owned an interest in one of the tracts, and secured their signatures to the lease by making an interlineation therein giving them the right to receive their share of the royalty. The original lessor had no knowledge of the interlineation at the time, but was shortly thereafter advised of it, and made no objection, but throughout the term insisted on the performance of the contract by the lessee, and accepted the royalties thereunder. *Held*, that he thereby waived the right to insist on the invalidity of the lease because of the alteration.

2. SAME—PARTIES—PERSONS NOT NAMED IN BODY OF INSTRUMENT.

Under the law of West Virginia a person whose name is not mentioned in the body of a lease is not a party thereto, nor bound thereby as a grantor, although he signs and acknowledges it as his deed.

3. SAME—POWER TO GRANT—TENANT BY THE CURTESY.

A tenant by the curtesy cannot convey the right to a lessee to extract oil from the land, and a lease executed by him purporting to convey such right is void.

4. SAME—RIGHT OF LESSEE TO EXTENSION OF TERM—FAILURE TO DEVELOP PROPERTY.

Defendant executed to complainant's assignor an oil and gas lease on royalty covering 74 acres of land, which was to run for the term of five

¶ 1. See Alteration of Instruments, vol. 2, Cent. Dig. §§ 94, 105.

years, and as much longer "as oil or gas was found in paying quantities." It required the lessee to complete a well thereon within three months, which he did, but drilled no other wells, and made no serious effort to do so during the five years, although he was repeatedly requested to do so by the lessor. The well drilled was a small producer, and was pumped at intervals, only, during the last year or two of the term, not producing enough to pay the expense of pumping. *Held*, that the lessee did not comply with the implied condition of the lease, which required him to develop the property in good faith; and that a court of equity would not sustain and enforce the lease in his behalf after the expiration of the five years, as against the lessor and others to whom he had leased after that time, and who had rendered the property productive.

In Equity.   Suit by a lessee for the enforcement of an oil lease.

Van Winkle & Ambler, for plaintiff.

A. D. Follett and Clyde B. Johnson, for defendants.

JACKSON, District Judge. The question in controversy in this case is the validity of a lease executed by John Boley to S. T. Mallory on the 11th day of January, 1895. By the terms and provisions of that lease 100 acres of land, more or less, was granted by the lessor to the lessee for a period of five years, and as much longer as "oil or gas was found in paying quantities," paying to the lessor the one-eighth part of the oil as royalty. It appears from the evidence that this lease embraced four tracts of land,—one tract of 45 acres, one tract of 25 acres, one tract of 4 acres, all of which belonged to John Boley, and one tract said to contain 40 acres, but turned out to contain 68 acres, belonging to the heirs of Caroline Boley. John Boley, in making this lease, consolidated these tracts, and gave a lease as if it were but one tract. Shortly after the lease was executed, it was discovered that John Boley was merely a tenant by curtesy, his wife, Caroline Boley, having died some time previously, which left him no estate in the 68 acres except a life estate as tenant by curtesy. The evidence discloses the fact that shortly after this discovery Mallory saw the heirs of Caroline Boley, and secured from them their signatures to the lease, but before securing their signatures he was compelled to insert a provision in the lease that the heirs of Caroline Boley were to receive their share of the royalty from the 40-acre tract. This interlineation or insertion was made in the absence of John Boley, and he was in no wise a party to it, though it is very evident from the evidence that he was informed of this change in the lease, but he never raised any question about it during the whole period of five years the life of the lease. Some time in February, 1895, Mallory commenced drilling a well on the four-acre tract, and completed and drilled it on the 4th day of March, 1895. The well was then pumped, and after a short time it was shut down. This well was pumped at intervals from time to time during the lifetime of the lease, but there never was any continuous pumping of the well, for the reason, as is apparent from the evidence, that the production of the well was so small that it did not justify a continuous pumping, and was, therefore, only pumped by "heads." The evidence shows that but one well was drilled upon the leased property, although the lessor repeatedly during the lifetime of the lease requested Mr. Reynolds, the agent of the lessee to put down other wells

and develop the property; and to notify Mr. Barnsdall, to whom the lease had been assigned, of his various and repeated requests. The evidence discloses that there was never any effort upon the part of Barnsdall or his agent to further develop the property, although his agent repeatedly promised to drill wells upon the leased premises, unless the effort of Mr. Reynolds to "move a rig to the John Boley farm from the Jobe Smith place in March, 1899, for drilling for oil," is to be considered an act upon the part of the lessee tending in good faith to comply with the terms and provisions of the lease. The witness Owen Boley says he was approached about that time by Reynolds, the agent of Barnsdall, and that he agreed to haul that rig, as the evidence discloses, for $25, and that John Boley, the lessor, in the lease objected to him crossing his land to place the rig on the leased premises, and the effort to move the rig seems to have ended there. There is no evidence tending to show that Reynolds, as the agent of Barnsdall, ever made any other effort to do any drilling on the leased premises. This objection of John Boley to Reynolds crossing his land for the purpose of carrying a rig is set up as a reason why the lessee could not comply with the terms of the lease. On the 14th day of April, 1900, John Boley executed a lease for 45 acres of land, a part of the premises leased to Mallory on the 11th day of January, 1895, to Watt and others. On the 12th day of May, 1900, John Boley leased the 25-acre tract of land to A. H. Highby another portion of the leased premises, which was leased to Mallory by John Boley on the 11th day of January, 1895. On the 7th day of April, 1899, Barnsdall served a written notice on C. J. Watt and others that he claimed the property that had been leased by John Boley to S. T. Mallory on the 11th day of January, 1895, and was afterwards assigned by Mallory to him, which notice appears to have been served before John Boley leased to Watt and others. On the 5th day of September, 1900, Barnsdall filed his bill in equity in this court, and obtained an order from the court restraining all the defendants in the bill from interfering with his rights under the lease of January 11, 1895, or from drilling or operating upon any part of the said leased premises, and from removing the oil therefrom. It is clearly the object and purpose of this bill to insist upon the terms and provisions of the lease between the contracting parties of the 11th day of January, 1895. To this bill, answers of various defendants have been filed, denying the validity of the lease, and insisting that whatever rights the lessee had under the lease have been terminated, not only by the expiration of the term for which the lease was given, but by reason of the fact that the lessee had utterly failed and neglected to prosecute in good faith the development for oil under the leased premises. The lease was executed on the 11th day of January, 1895, and was to run for a period of five years, and as much longer as oil or gas was found in paying quantities. The evidence discloses that there never was but one well drilled upon the property, and that well is what is termed a "small producer," and during the period of over five years—the lifetime of the lease—it only produced about 800 barrels.

119 F.—13

The first question to be considered is the question raised by the defendants as to the validity of the lease of January 11, 1895, who insist that the interlining and inserting in the lease the words "forty acres, more or less, of Caroline Boley, her heirs, are to receive their share of the royalty, that is included in the lease," after the lease was executed and delivered by John Boley to S. T. Mallory, was such an alteration of the contractual relations between the parties as would render it invalid, and not binding upon the defendants. It is a general rule that, where a written instrument shows an alteration by interlineation or erasure upon its face, the presumption, in the absence of evidence, is that it was made after the execution of it, and the burden is upon the party claiming under the instrument to explain the alteration. 2 Am. & Eng. Enc. Law (2d Ed.) p. 276, § 5, and the authorities there cited. Upon the evidence in this case there can be no question that the alteration was made by the parties without fraudulent intent, after the execution of the contract between John Boley and S. T. Mallory on January 11, 1895, and in this instance would not be binding on John Boley, who was the only lessor in the contract prior to the execution of the lease by the heirs of Caroline Boley, unless by unequivocal acts he waived any advantage that he could take of such an alteration, and recognized the binding effect of the lease between himself and the lessee. It is clearly apparent from the evidence that he knew of the alteration in this lease very shortly after the alteration was made; that he made no objection to it; that he never gave any notice to the lessee that it was invalid, or that he would not be bound by it, but, on the contrary, he recognized the legal and binding effect of the lease by receiving and collecting the one-eighth royalty provided for by the terms of the lease as a rental, which was to be paid to him. This recognition upon his part continued during the lifetime of the lease, during which time he never raised any objection in regard to its alteration. Can it be said, and ought a court to hold, that, where a party has executed a paper of this character, and the alteration made in it after its execution has been brought to his attention, and he makes no objection to it, but acquiesces in the alteration, and enforces the terms and conditions of his contract in other respects, that, after the life of the contract had expired, he can avail himself of a defense of this character? I think not. His acquiescence in the lease and collection of the royalty during the lifetime of the lease must be held to be a waiver upon his part of any objection that he might have or could have taken in regard to the alteration, and for this reason he is estopped from setting up such a defense.

Another objection to the validity of the lease raised by the defendants is that the heirs of Caroline Boley are not named as grantors in the body of the lease, and that for that reason the lease is invalid, and not binding upon them. In the courts of this country there is some contrariety of decisions upon this legal question, some courts holding that the name of the grantor need not appear in the body of the deed if the identity of the grantor can be ascertained with reasonable certainty. I am relieved, however, from discussing this question, for I think it is well settled by the authorities both in Vir-

ginia and West Virginia that, where the name of a grantor does not appear in the body of a deed, and where there is no mention of the grantor in the body of the deed as a party to it, although he may have signed and acknowledged it as his deed, it does not convey anything. Judge Snyder, in the case of Adams v. Medsker said: "No one who is not a party to the deed can be bound by it or by its covenants; and no one can be a party who is not mentioned or referred to therein." Adams v. Medsker, 25 W. Va. 127; Bell v. Allen's Adm'r, 3 Munf. 118; Bartley v. Yates, 2 Hen. & M. 398; Beale v. Wilson, 4 Munf. 380. In this case the evidence clearly shows that the lease was signed by the heirs of Caroline Boley, but the acknowledgment certified to by the justice is disputed by two of the parties who signed the lease. Nowhere does it appear upon the face of this lease that any of the heirs of Caroline Boley were named as grantors in the lease, nor were they ever consulted in regard to the lease at the time it was executed between Boley and Mallory. It is true that they signed it, but, so far as the evidence discloses, nothing has occurred since the execution of the lease to prevent them from setting up this defense. The evidence clearly shows that two of the heirs of Caroline Boley—Levi W. Boley and A. J. Boley—never acknowledged the lease, and the testimony of the justice who took the acknowledgment, in speaking of it, says that he does not recollect that they were ever before him, or that they ever acknowledged it, although he certified to the acknowledgment. His testimony upon this point is very unsatisfactory. Of course, he cannot be heard to deny his official certificate, but other parties interested as these defendants are have a right to show that they never acknowledged the lease, and to contest the correctness of the certificate of the justice to that fact. For this reason we conclude that they are not bound by it. It is apparent that these two heirs of Caroline Boley, who were induced to sign the lease, never acknowledged it, for they did not sign it at the office of the magistrate, nor did they sign it at the same time and place that John Boley signed it, but at different places and upon different occasions. It also appears that two of the heirs John E. Boley and Robert Boley were under age at the time they signed and acknowledged the lease, and it does not appear that they ever ratified it since they became of age, and for this reason they are not bound by the terms and provisions of the lease.

It is not denied that at the time John Boley executed the lease to Mallory he had no title to the land. His only claim to the land was that of possession as a tenant by curtesy, which only gave him a life estate in the realty. While such an estate gave him the right to the full enjoyment of the use of the land during its continuance, it did not permit him to commit any waste which would lessen or diminish the value of the freehold estate. The lease that John Boley entered into with Mallory authorized Mallory to extract and take the petroleum oil from under the land covered by the lease. Being a mere tenant for life, and only entitled to the possession of the property, he had no such legal interest in the estate as authorized him to enter into a contract with any one to explore and drill wells upon

the property for the purpose of extracting and taking from it petroleum oil. This principle has been settled in West Virginia in the cases of Williamson v. Jones, 43 W. Va. 562, 27 S. E. 411, 38 L. R. A. 694, 64 Am. St. Rep. 891; Wilson v. Youst, 43 W. Va. 826, 28 S. E. 781, 39 L. R. A. 292. In both of these cases it was held that petroleum oil was a part of the realty, and, being part of the realty, a tenant for life had no right to lease the land to any one for the purpose of extracting and taking petroleum oil from under it.

It is apparent from what I have said that the lease of John Boley to S. T. Mallory on the 11th day of January, 1895, so far as the 40 acres, now known as the "sixty-eight acres," is concerned, conferred no right or power upon Mallory or his assignees to drill and extract oil from under that tract of land. It is absolutely void for that purpose. Boley had no title to the realty, and he could not grant and convey a right to another which he did not possess. The heirs of Caroline Boley, being the owners in fee by inheritance, were the only parties who could grant and convey a right to any one to drill and operate for petroleum oil upon the leased premises. As we have seen Levi W. Boley and A. J. Boley never acknowledged the lease, and John E. Boley and Robert Boley were minors, and could not execute a contract that would bind them, and that since they arrived at age they have never ratified their action, we reach the conclusion that these four parties to the lease are not bound by it. The two other parties to the lease Mrs. Lotta B. Adams and Mrs. Nora Sunderman signed the lease, but only Mrs. Adams acknowledged it, and, as they were not grantors in the body of the deed of lease, nor mentioned in it, I am of the opinion that this lease is invalid and void for the purpose of granting to the lessee the right to drill and extract petroleum oil from under that portion of the leased premises embraced in the 40-acre tract.

Having reached the conclusion that the lessee, or his assignees, acquired no rights under the lease of January 11, 1895, so far as it proposes to grant the right to develop the land covered by it for oil on the 40-acre tract of land, I will now consider what are the rights of the lessee as to the 45, 25, and 4 acre tracts, which are covered by the lease as one tract. No question is raised as to John Boley's right to lease these tracts for the purpose set out in the lease, but it is claimed by the defendant John Boley that the rights of the lessee have ceased by the terms of the lease, and that the lessee has no right to maintain this action against him as the owner and lessor of the land. Upon this question the doctrine of estoppel does not arise, as the lease expired by its own limitation. The only question for consideration is, has the lessee the right to hold the leased premises after the expiration of the lease? If, then, the lessee has complied with the terms and provisions of the lease under which he claims the right to operate and develop the tract of land for oil purposes, there could be no question as to his legal rights under the lease; but it is claimed by the lessor that the lessee has failed to comply with the terms of the lease by neglecting to develop, in good faith, the territory embraced and covered by the lease for oil purposes. As we have seen, I have reached the conclusion that John Boley

cannot avoid or excuse himself from complying with the terms of his lease to Mallory, as to the 45, 25, and 4 acre tracts; but, while that is true, it does not excuse the lessee from complying with the terms and conditions of the lease on his part.

The question that presents itself for the further consideration of the court is, has the lessee in good faith complied with the terms and conditions of his lease, and is he entitled to the relief sought for by his bill? On January 11, 1895, S. T. Mallory leased from John Boley 100 acres of land, more or less, "for the purpose and with the exclusive right for operating thereon for oil and gas," together with other rights, which· are immaterial to refer to. That lease was for the term and period of five years from its date, and as much longer as oil or gas was found in paying quantities. There was a provision contained in the lease in reference to gas, which is not deemed important to refer to, as the only well drilled is not a gas well.· The lease required that a well should be completed upon the premises within three months from its date. Unless completed it should be null and void. There was a well drilled on the lease within the three months, the time provided for in the lease, and was a compliance with that provision of the contract; therefore, no forfeiture could take place. It is contended, however, that the evidence discloses that the lessee did not in good faith proceed to develop and operate the territory embraced in this lease for oil and gas. By the terms of the lease it had five years to run. During the lifetime of the lease there was but one well put down, although the evidence discloses that the lessor, John Boley, often requested and demanded that the lessee should proceed to develop the land covered by the lease for petroleum oil, and, as often as he requested, the agent of the lessee promised to comply with his requests, but, as I have said, there was no effort upon the part of the lessee to comply with the repeated demands of the lessor, unless the futile attempt by Reynolds, as the agent of the lessee, in March, 1899, to have a rig placed upon some portion of the land for the purpose of drilling another well, was an act in good faith upon the part of the lessee as evidence of his intention to comply with the terms and provisions of the lease. It is true that Owen Boley says that John Boley, the lessor, notified him not to cross his land for the purpose of hauling a rig upon the leased premises to drill another well. Owen Boley, who made the contract with Reynolds, says he notified Reynolds of that fact, and Reynolds admits that he did; but it does not appear from the evidence that there was no other way of getting upon the leased premises to continue the operations of drilling another well, nor does it appear that the agent of Barnsdall, or Barnsdall himself, ever made any strenuous effort, either legal or otherwise, after the information that Owen Boley conveyed to Reynolds to go upon the leased premises for the purpose of further development. This information was conveyed to Reynolds in March, 1899, less than a year before the lease, by its own terms, expired, which should have caused the lessee to have taken immediate action to assert his rights, if any he had. There is not even a pretense that such was the fact.

Is a court of equity, disposing of rights between parties, to hold

that an obstruction of that character is a reason why the lessee in this case should be absolved and released from the performance of his duties under the contract? I think not. It was a reason why a greater effort should have been made, if the agent of the lessee intended in good faith to proceed with the further development of the leased premises for oil. There is no evidence in this case that another effort was made before or since that time during the lifetime of the lease, nor, in fact, since its termination. We must hold that this excuse for a failure to prosecute the work in the development of the lease for oil is inadmissible as a defense upon the part of the lessee in neglecting to comply in good faith with its legal requirements. But it is claimed that, inasmuch as the lease provided that the lessee could hold, not only "for the term and period of five years from its date, but as much longer as oil or gas was found in paying quantities thereon," the lease is valid, and binding upon the lessor, John Boley, for the reason that the one well that has been drilled upon the leased premises known as the "four-acre tract" produced oil, and that he had received his royalty from that production. The evidence discloses, as we have said, that it is a small producer; in fact, so small that it did not justify the continuous pumping of the well; and when it was last pumped in 1899, it only yielded about three-fourths of a barrel per day. Reynolds testified in reference to pumping the well, and says "that he hired a pumper there to pump the well along, and furnished the fuel for it." The evidence of six witnesses of great experience in the oil fields has been taken in this case, who have had long experience both in drilling and pumping wells, and they state that a well yielding no more than this well has yielded, as shown by the evidence, could not of itself be a paying well. What is a paying well? Is the cost of drilling a well embracing the machinery purchased for that purpose to be considered as an element to determine whether it is a paying well or not? I think not. It must be a well whose product covers the expenses incident to the pumping of it. If it does not pay a profit over the operating expenses, can it be said that oil is found in paying quantities? I think not. It was expressly held in the case of Young v. Oil Co., 194 Pa. 243, 45 Atl. 121, that where oil has been found, but no longer pays the expenses of production, that it is not producing in paying quantities, and, applying that principle to the terms of this lease, if oil at the date and institution of this suit and for some time previous had not been found in "paying quantities," would it be right and just to prevent the lessor from releasing his land? The answer to that question is obvious. The principle established in that case is that sufficient oil must be found to justify the operator in pumping the well or wells at a small profit over and above the actual expenses.

An exhibit has been filed by the plaintiff in this case, claiming that it is a statement of the Eureka Pipe Line Company of the oil received by that company from Barnsdall and Reynolds, commencing with December 3, 1895, and closing with April 1, 1901, which is a period of nearly six years from the date of the execution of the lease by John Boley to S. T. Mallory. That exhibit shows that during that period 806.61 barrels were produced, which is an aver-

age of 134.43 barrels per year. It does not appear from that exhibit where that oil came from. It only appears that Barnsdall and Reynolds had such an oil account; but, assuming the fact to be true that it came from the Mallory well, which was drilled on the four-acre tract, we find that the well produced during the year 1900 104.95 barrels, or about 12 gallons per day. It does not appear what the price of oil was at that time, nor what the price of oil was at the end of five years, when the lease was, by its own limitation, terminated. The question that presents itself at this point is, if this was a paying well, why was it that the lessee did not proceed to drill other wells, and to further develop the tract? Why would he content himself with a small producer like this, which was merely paying at best a small profit over its expenses during the first years of the lease, when the evidence tends to show that it did not pay any profit at the end of the lease? What the motive and purpose for such action was, I am unable to determine, unless he was satisfied that the territory was what is termed in the oil parlance "dry territory." It is true that he pumped this well at various times, pumping off what might be called the "heads," but it is equally true that at various times he removed his machinery from the leased territory, and for the time seemed to have abandoned it. If, in fact, it had been a paying well, why did he remove his machinery, and cease to pump it? The well did not flow. It could not be pumped continuously, and when pumped in the last three or four years it was only pumped by "heads," and finally it did not yield more than 12 gallons per day, as the evidence discloses. Mr. A. J. Boley proves that the well was pumped occasionally from time to time until August or September, 1896, and that after that "the well stood for a long time, and was shut down," and from that time to the time he gave his deposition in this case—which seems to have been taken in April, 1900—it had not been pumped on an average of once a month. It is apparent to my mind that the lessee pursued this course in regard to this well with the hope that such action would preserve his rights under the lease. Can it be said that, where a man "sleeps upon his rights," as the lessee has done in this case, such action upon his part is in good faith? Was it good faith to hold the lease for a period of five years, and only drill but one well on the leased premises, and that well a failure, as the evidence shows? I think not. Is it evidence of good faith to pump a well at a loss to the lessee for two or three years before the expiration of the lease? I think not. I am aware that decisions of some courts hold that the lessee is to determine whether the lease is a paying one or not, but the lessee must act in good faith. The lessee should not be permitted in a court of equity to insist upon retaining a lease after its term had expired without having made any effort upon his part in good faith to develop the property. Certainly he ought not to be permitted to hold the lease merely to prevent others from drilling upon the territory covered by the lease, which would operate a great injustice to the lessor. The lessor when he entered into this lease with S. T. Mallory had a right under its terms to expect that the property would be developed; and he had a right to insist upon it, as he did from time to time, that the property should be developed; but, notwithstanding

his repeated demands to have the property developed, the lessee disregarded, not only his wishes, but his interests in the property. Contracts must be mutual. The rights of the lessor must be protected just as fully as the rights of the lessee. When the lessee, as in this case, neglects and refuses to comply with the contract in good faith, we must hold that the provision in the contract, which says "that the lessee is to have the leased property, not only for a period of five years, but as much longer as oil or gas is found in paying quantities thereon," is a provision that is to be construed with reference to the rights of the lessor as well as the rights of the lessee. The lessee will not be permitted to retain possession and control of the leased premises merely because of the insertion of the words in the lease "as much longer as oil or gas is found in paying quantities" unless oil is actually found in such a quantity as to warrant the lessee in pumping the well. In determining this question he must exercise sound discretion, such as prudent business men would ordinarily exercise in the management of their business; but this discretion, when exercised by him, must be a discretion in good faith, not an arbitrary one upon his part. It must be a discretion based upon the product of the well, which alone can demonstrate whether it is a paying well. Is the lessor to be deprived of his rights in having his property developed when wells may be and are sunk all around his property, because the lessee may claim the right to develop the property when it suits him? Having drilled but one well on the leased premises, and because the lease only provided for one well to be drilled upon it, and failing to further develop the property, it would seem to be the duty of a court of equity to interfere, and redress the rights of a lessor under such circumstances. If the lessee had within the period of five years drilled other wells on the leased premises, and showed a disposition to develop it, a court of equity, under such circumstances, would be justified in holding that such action was a compliance with the terms of the lease. He who asks equity must do equity. The plaintiff in this case has asked for relief. What relief is he entitled to? Can a court of equity grant him any relief if it reaches the conclusion that he has frittered away his rights, and never discovered that there were any obligations upon his part under the lease to develop the property for oil during the term of five years the life of the lease? I think not.

It is said by the court in the case of Harness v. Oil Co., 49 W. Va. 232, 38 S. E. 662, "that the production in paying quantities of either oil or gas, and the payment or delivery of the royalty as provided for in the contract, will perpetuate the lease during the time of production." There can be no question about that proposition of law that the lease will be perpetuated during the production in paying quantities of either oil or gas. But such is not this case. This is a case that more properly falls within the ruling as stated in Steelsmith v. Gartlan, 45 W. Va. 27, 29 S. E. 978, 44 L. R. A. 107, which holds that a completion of a nonproductive well, though at a great expense, vests no title in the lessee. This well, as the evidence discloses, seems to be a nonproductive well. Although the drilling of the well has cost the lessee possibly a large sum of money,

yet that fact alone does not condone his neglect to operate and develop this lease, nor does it release him from his obligations in good faith to do so. I see no reason why a lessee should hold on to the property of the lessor during the lifetime of the lease, claiming the right to operate it at his pleasure, and thereby defeat the rights of the lessor to relet the property to parties who would develop and operate it. Such is the history of this case. The lessor quietly awaited the expiration of the lease. He repeatedly asked and demanded of the lessee that the leased premises should be developed, to which repeated requests and demands there came nothing but promises, which were never fulfilled. The lessor then determined to relet the 45-acre tract to Watt and others, and the 25-acre tract to A. H. Highby. The lease to Watt and others was made in April, 1900, and the lease to A. H. Highby in May, 1900. The lease to S. T. Mallory expired on the 11th day of January, 1900. This bill was filed on the 5th day of September, 1900, about four months after these leases were made to Watt and others and A. H. Highby, and not until after it was discovered that the drilling under these leases produced paying wells. Can it be said that a court of equity will permit a lessee to wait until after the expiration of his leased term with a nonproductive well, and drill but one nonproductive well during the lifetime of the lease to enforce that lease, and hold it valid against the lessor by reason of the fact that he alone is to determine whether or not this nonproductive well is a well in paying quantities? I think not. I think that equity will require good faith upon the part of the lessee in the performance and discharge of his obligations under his contract. What that good faith is must be determined by all the surrounding circumstances.

The lessor, when he made this lease to Mallory, contemplated the development of the leased premises, and had a right to expect, by the very terms of the lease, that the property would be developed in good faith. This was the main consideration for the execution of the lease, and, if the lessee failed to fully develop the property during the lifetime of the lease, the lessor had a right to conclude, after the lease had expired by its own limitation, that the lessee had abandoned it, and lost his rights under it, and would, therefore, be justified in re-leasing the property. It was held in the case of Foster v. Gas Co., 32 C. C. A. 560, 90 Fed. 178, that:

"The agreement to dig one well within one year secures the prompt beginning of these operations. The completion of the well saves the penalty. It does not amount to a fulfillment of the covenants. The consideration, therefore, for this lease was the prospective rents and royalties the lessor would enjoy if the lessee, by diligent search, could find oil and gas in paying quantities. If the lease failed to bind the lessee to diligent search for oil or gas, it was without consideration, binding on neither party, and voidable at the pleasure of either."

This position is sustained by the following line of cases, to wit, Cowan v. Iron Co., 83 Va. 547, 3 S. E. 120; Petroleum Co. v. Coal, Coke & Mfg. Co., 89 Tenn. 381, 18 S. W. 65; Ray v. Gas Co., 138 Pa. 576, 20 Atl. 1065, 12 L. R. A. 290, 21 Am. St. Rep. 922. In the last-quoted case the supreme court of Pennsylvania says:

"The clear purpose of the lessor was to have his lands operated for oil and gas, and the condition was inserted for his benefit. Whilst the obligation on

part of the lessee to operate is not expressed in so many words, it arises by necessary implication. The lease was for the expressed purpose of drilling and boring for oil or gas; the lessor, in a certain event, to receive a share of the production as a royalty or rent, and, in another event, to be paid $500 per annum for each gas well the product of which was conducted from the land for consumption."

I am inclined to think, under the circumstances of this case, that the lessee, or his assignees, has neglected to comply with every provision of the contract except that provision which requires the sinking of one well, and the lessee, or his assignees, are justly chargeable with laches for having slept so long on their rights by their failure and neglect to comply with the terms of the lease.

For the reasons assigned, I reach the conclusion that neither the lessee, S. T. Mallory, nor his assignees, who claim under him, are entitled to enforce the terms and provisions of the lease of January 11, 1895, against the grantor, John Boley, or those claiming by subsequent leases under him. But, inasmuch as the lessor, John Boley, has waived in his pleadings his right to enforce a forfeiture of the rights of the lessee as to the four acres, a decree will be drawn giving the lessee the right to elect whether he will further develop the four acres, or abandon it, with leave to remove all his machinery, tackle, and appliances ordinarily used in drilling an oil well.