## WEISANT v. FOLLETT ET AL.

*Landlord and tenant—Oil lease—Burden of proof—Development of leasehold and protection of property—Evidence—Experience of lessee or opinion of inexperienced lessor—Proof of nature and extent of duty—Term as long as oil found in paying quantity—Shackling wells and pumping from central plant determinative.*

1. The burden is upon the lessor, plaintiff, to prove that the lessee has failed in his duty to develop the leasehold and protect its boundaries by timely and sufficient drillings.

2. In the absence of indication of bad faith or selfish personal motive, the experience, interest and judgment of a lessee are ordinarily controlling as against the opinion of a lessor who is inexperienced as to what constitutes performance of duty in developing and protecting an oil leasehold.

3. It is competent to prove the nature and extent of duty in developing and protecting an oil leasehold by one who is skilled and experienced in such work, and who speaks from familiarity with the environments of the lease in question, or who bases his testimony on other evidence in case showing surrounding and attaching conditions.

4. When the term of a lease was to continue "as long as oil may be found in paying quantities," and the shackling of a large number of wells together, located on different leaseholds, operated by a single power plant, was in general use in the vicinity at the time of the making of the lease, it may be presumed that the parties contemplated such use and test, and their rights may be so determined.

(Decided November 27, 1922.)

APPEAL: Court of Appeals for Noble county.

*Mr. J. A. Okey,* for plaintiff.
*Mr. C. C. Middleswart,* for defendants.

Roberts, J.   This action was brought in the
court of common pleas of Noble county, seeking
to have an oil and gas lease adjudged terminated
and the title of the lessor quieted.   The facts in-
volved, essential to a consideration of the issues,
briefly stated, are substantially as follows:

On the 7th day of August, 1902, the plaintiff exe-
cuted and delivered to B. F. Taylor, as lessee, an
oil and gas lease on 136 acres of land described
in the amended petition, located in Enoch town-
ship, Noble county, Ohio.   By several mesne as-
signments J. C. Densmore, on April 23, 1910, be-
came the owner of this lease.   Subsequent to the
commencement of this action he died, and revivor
was made in his legal representatives, as indi-
cated by the title.   Previous to the commencement
of this action nine wells had been drilled for oil
on the leased premises, and one well was drilled
after the commencement of the action.   There is
some uncertainty in the testimony as to how many
of these wells were producing wells.   It is indi-
cated, however, that several were pumped for a
time and later abandoned as not profitable, and
at the time of the commencement of the action only
three wells, known as numbers one, three and eight
were being operated.   The last of the wells drilled
previous to the commencement of this action was
drilled in 1905.   No wells were drilled for gas, and
it is said that the wells occupy a space of only
about thirty acres of the leased premises.   During
the period of this lease, oil has been produced by
being pumped from a central pumping power sta-
tion located on an adjoining farm known as the
Crock farm, where a gas power plant was located,
and the wells on this lease, together with wells on
other adjoining farms under other leases also

owned by Densmore, were connected, some twenty-five in number, by what is known as the shackling method, and all pumped by the power furnished from this one plant, operated by one man. There is no contention in this case that the wells on this lease, so operated, charged proportionately with the expense of operating the whole group, are not profitable, and that by this method oil is not being produced in paying quantities. There is some dispute between the parties as to whether or not if only the three wells on this lease were pumped by a power plant, unconnected with the wells on other leases, they could be operated at a profit; or, in other words, whether oil could, in that way, be produced therefrom in paying quantities. For the purpose, however, of considering the issues presented, it will be assumed that as a matter of fact the operation of the three wells, unconnected with those of other leases, would not be profitable, and that the wells would not produce oil in paying quantities if operated alone. The evidence indicates that as now operated the whole group of some twenty-five wells is pumped by one man, receiving a salary of $90 per month, and that the cost of pumping the three wells, unconnected with the others, would not be substantially less than pumping all as now connected. These wells, at the time the case was heard in the court of common pleas, as learned from the testimony, were producing about three-fourths of a barrel of oil per day each, of the value of six dollars per barrel. Other evidence in the case indicated that wells producing only eight gallons of oil per day are being operated profitably in the vicinity by shackling a large number of wells together.

It is a condition of the lease that "This lease shall be for a term of two years, or as much longer thereafter as oil or gas may be found in paying quantities."

It is also provided in the lease, in addition to the granting of the oil and gas in and under the premises described, as follows:

"Together with the exclusive right to enter thereon for the purpose of drilling or operating for oil, gas or water, to erect, maintain and remove all structures, pipe-lines and machinery necessary for the production and storage of oil, gas or water."

It is the prayer of the plaintiff in his amended petition that the lease be adjudged null and void; that it may be cancelled and the plaintiff's title quieted against the estate of the decedent; and that the defendants be enjoined from drilling any further wells on the premises.

The plaintiff claims that he is entitled to this relief upon two grounds: first, that by reason of the conduct of the lessee, considering the amount of drilling which has been done for oil, the extent of territory included in the lease, and all the surrounding circumstances and environments, the lessee has failed to develop the lease and to protect the boundaries thereof, to such an extent as to constitute an abandonment of the lease, or, if not an abandonment of the whole lease, then of such part thereof as has not been developed or protected; and second, that as a matter of fact oil is not found on the premises in paying quantities.

These two propositions will now be considered. It is said in *Harris* v. *Ohio Oil Co.*, 57 Ohio St., 118, in the first paragraph of the syllabus:

"There is an implied covenant on the part of the lessee, that he will drill and operate such number of oil wells on the lands as would be ordinarily required for the production of oil contained in such lands, and afford ordinary protection to the lines."

In the opinion it is said at page 127:

"So under an oil lease which is silent as to the number of wells to be drilled, there is an implied covenant that the lessee shall reasonably develop the lands, and reasonably protect the lines. The development and protection of lines which is thus implied when the lease is silent, is such as is usually found in the same business of an ordinarily prudent man, neither the highest nor lowest, but about medium or average."

In the case of *Steele* v. *American Oil Development Co.*, 80 W. Va., 206, 92 S. E. Rep., 410, L. R. A., 1917E, page 975, it is said in the syllabus:

"4. A verdict for damages, based upon evidence which does not show with reasonable certainty that the complaining party was injured, or the extent of his injury, cannot be sustained."

In the opinion it is said, quoting from *Jennings* v. *Southern Carbon Co.*, 73 W. Va., 215:

" 'Hence, the practically universal interpretation of oil and gas leases is that, where the contract does not expressly state what shall be done by the lessee, there arises the legal implication that, if the latter finds one or both of these minerals on a lease operated by him, or if either he or other operators find them on adjoining lands, he will drill as many wells as will afford sufficient protection against drainage, and otherwise so develop the leased premises as to serve the mutual

benefit of both lessor and lessee. * * * Hence we say that, although the judgment of one experienced in developments under leases of this character is controlling, when compared with that of the landowner, who is without such experience, yet his judgment, if fraudulently exercised or exercised solely to promote his individual selfish interest, thereby ignoring the interests of the lessor, such judgment, being fraudulent, will not avail. To serve him, it must conform to that judgment generally exercised by other operators under similar circumstances and conditions, and in view of the real purpose and intention of the parties when entering into the agreement.' "

Quoting from *Grass* v. *Big Creek Development Co.,* 75 W. Va., 719:

"To entitle him [the plaintiff] to damages for unreasonable or arbitrary evasion of implied covenants of an oil and gas lease, nothing therein preventing, for diligent prosecution of operations, either mineral being found in paying quantities on the premises, plaintiff assumes the burden of showing, and by clear and convincing proof must to avail him show, by witnesses having experience and skill and engaged in similar operations, that the lessee, having due regard for the advantage and profit of himself and lessor, has not, surrounding circumstances and conditions being considered, exercised ordinary diligence in conducting such operations. If he has, plaintiff cannot recover. Among such circumstances and conditions are the situation of the parties; the character of the mineral products; the nature of the oil-bearing sand, whether dense or soft and porous; developments on contiguous lands, whether by same or different

operators; cost of drilling; proximity to market, and facilities for marketing; current prices, whether high or low; location of the lands, and such other conditions attendant upon the operations as may explain necessity for prompt, or excuse for delayed, action in prosecuting such developments."

It should be borne in mind in the consideration of this case that the lease contains no express forfeiture clause; that the plaintiff does not ask for a forfeiture, but, rather, contends that the lease, by its terms and conditions, has terminated; that because of the failure to protect boundaries and properly develop it has been abandoned; and that its term has ended by reason of oil not being found in paying quantities.

In the *Grass case, supra,* the syllabus holds:

"The owner of a lease for the production of oil and gas, containing the usual terms and conditions, must, if either mineral is found in paying quantities on the lands, exercise due and reasonable diligence in prosecuting operations thereunder for the mutual benefit of himself and his lessor; and if he unreasonably fails or refuses so to do, damages therefor are recoverable against him in an appropriate action at law.

"The judgment of an operator of such lease, as to the diligence with which and extent to which wells should be drilled thereunder, upon discovery of either mineral in paying quantities, will control, if exercised in good faith and not unreasonably or arbitrarily to promote his own peculiar benefit, to the manifest prejudice of the lessor. Both are bound by that degree of diligence which, surrounding circumstances and conditions being considered, would reasonably be expected of opera-

tors of ordinary prudence, experienced and engaged in the same business, having due regard for the interests and advantages of themselves and their lessors.

"To entitle him to damages for unreasonable or arbitrary evasion of implied covenants of an oil and gas lease, nothing therein preventing, for diligent prosecution of operations, either mineral being found in paying quantities on the premises, plaintiff assumes the burden of showing, and by clear and convincing proof must to avail him show, by witnesses having experience and skill and engaged in similar operations, that the lessee, having due regard for the advantages and profit of himself and lessor, has not, surrounding circumstances and conditions being considered, exercised ordinary diligence in conducting such operations."

Quoting from *Hennessy* v. *Junction Oil & Gas Co.*, Supreme Court of Oklahoma, 182 Pac., 666:

"The lessee, acting in good faith and upon his honest judgment, not an arbitrary judgment, or one springing from an ulterior purpose to secure an unfair advantage of the lessor, is to determine whether or not the well brought in produces gas in quantities large enough to transport."

Quoting now from *Barbour, Stedman & Co.* v. *Tomkins*, 81 W. Va., 116, 93 S. E., 1038:

"Under an oil and gas lease for the term of five years and as long thereafter as either mineral is produced from the land in paying quantities, the production required to effectuate such extension, in the absence of equitable circumstances varying the rule, is that quantity which will bring a reasonable pecuniary return in excess of the cost

of production, regardless of any particular amount of profit derivable from the operation of the well.

"The lessor cannot terminate the lease merely because he thinks the quantity of gas discovered within the five-year period is not sufficient to constitute a paying well, where the operator, reasonably and in good faith, claims it is such a well and is willing to pay the rental stipulated therefor. His judgment, when *bona fide*, is entitled to great weight in determining whether the gas is in fact produced in paying quantities."

Other authorities to same effect are *Young* v. *Forest Oil Co.*, 194 Pa., 243; *Osborn* v. *Finkelstein,* 189 Ind., 11, 126 N. E., 11; *Lowther Oil Co.* v. *Miller Sibley Oil Co.*, 53 W. Va., 501, and *Manhattan Oil Co.* v. *Carrell,* 164 Ind., 526, 73 N. E., 1084.

The syllabus in the case of *Zeller* v. *Book,* 18 O. C. D., 119, reads as follows:

"1. An oil lease conditioned to run five years from the date thereof, or as long as oil or gas should be found in paying quantities, will not be vacated by a court of equity on the ground that the territory is so light as not to warrant the sinking of more wells.

"2. The fact that it is questionable whether oil wells on land held under a lease operative only so long as oil or gas should be found in paying quantities will ever yield a reasonable profit on the investment, is not sufficient ground for vacating the lease; the lessee is the sole judge on this question, and as long as he can make a profit therefrom, he will be permitted to do so.

"3. The mere fact that a lessee, under an oil lease conditioned to run as long as it is a profitable

investment, has failed to operate the wells for some time, will not be ground for vacating such lease, where such lessee shows good and sufficient reason why it has been impracticable for him so to do.''

In the case of *Ohio Fuel Supply Co: v. Shilling*, 101 Ohio St., at page 106, it is said in the opinion, at page 108:

''Was there productive gas, of sufficient quantity to warrant operations, under the lands of the lessor, and was the same drained into the wells on adjoining lands by reason of the failure of the lessee to drill wells for the protection of the lessor's lines?

''Any testimony of the plaintiff tending to show the surrounding circumstances, the location and productivity of wells on adjoining territory, the transitory nature of gas, the direction of its flow, or any other competent evidence tending to show that gas existed under her lands in sufficient quantity to warrant the expense of drilling and marketing, would be affirmative evidence tending to prove that the lessor was damaged.''

The opinion in the *Ohio Fuel Supply* case also cites several authorities approving the rule that the burden of proof in such issue is upon the plaintiff.

Having now cited authorities establishing the rules by which the duty of a lessee to develop territory and protect lines is determined, application thereof will be made to the instant case. From these authorities it is learned that in the absence of bad faith the duty of the lessee in this respect is largely left to his good judgment, influenced by his financial interest; that proof may

be made by evidence of the pertinent attending conditions and environments, and by the testimony of experts familiar with the situation or giving opinion upon a given state of facts.

In the case under consideration only incidental attention was given to these matters. The evidence indicates the number of wells drilled, the extent of their production, their location upon the lease, and the existence of a gas well on an adjoining lease. The evidence relating to this issue is entirely too meager to enable the court to form opinion concerning this issue, which is largely a matter of expert and technical knowledge. It is sufficient to say, further, that the evidence substantially fails to sustain the contention of the plaintiff upon this proposition.

The other issue submitted for determination in this action is whether the proposition of oil being produced in paying quantities may be determined by the present manner of operation, as hereinbefore stated, that is by shackling the wells on this lease with a large number of other wells and pumping at a greatly reduced expense, or whether the test must be made by considering what would be the cost of pumping the oil if these three wells were operated alone. This necessitates a construction of the clause in question in the lease which constitutes the contract between the parties:

"Courts, in the construction of contracts, look to the language employed, the subject-matter and the surrounding circumstances. They are never shut out from the same light which the parties enjoyed when the contract was executed, and accordingly they are entitled to place themselves in the same situation as the parties who made the

contract, so as to view the circumstances as they viewed them, and so as to judge of the meaning of the words and of the correct application of the language to the things described. It is therefore an established canon of construction that in order to arrive at the intention of the parties, the contract itself must be read in the light of the circumstances under which it was entered into. * * * It has been declared, moreover, that the prevailing notions and opinions in the place where the contract was made are presumed to have entered into contemplation of the parties, and if in accordance with law, are not to be discountenanced in construing the contract." 6 Ruling Case Law, 849.

In construing a contract it is said in *Third National Bank of Cincinnati* v. *Laidlaw,* 86 Ohio St., 91, on page 100:

"The language used, is to be understood in its plain, ordinary sense, as read in the light of surrounding circumstances, the situation of the parties, and the object of the guaranty, and that construction given which most nearly conforms to the intention of the parties."

It is apparent from the evidence in this case that the scheme of pumping oil in Noble and adjoining counties by shackling numerous wells together, and operating with a single power plant, centrally located, has been in general use for many years, and antedating the making of this lease. Wells in this section are generally of light production, and a large percentage of them could not be profitably operated without the use of this method.

The plaintiff lived upon the leased land and saw the lessee and the succeeding owners in-

stall and continue in operation this method of
pumping, without complaint. In this situation
it is presumed that the parties entered into this
contract, and used the language found therein,
anticipating that producing wells would be pumped
in the usual and ordinary manner, as was the case
under this lease. The lessee accepted the terms of
this contract, it may be assumed, understanding
that he would have the right to pump oil in this
manner; and, having made large expenditures in
the drilling of wells and in the developing of the
lease, it would be unjust to determine the right
to a continuance of a leasehold by requiring a test
not in general use, and which, if generally applied,
would put an end to the operation of thousands of
wells in this territory by lessees who have devel-
oped them; with the further result of decreasing
the supply and increasing the cost of an essential
commodity now being produced under most favor-
able circumstances, in lessened volume.

With the aid of interpretation of the lease, as
above indicated, it is apparent that the lessee
would have the right to pump the oil by a power
plant, at the same time pumping other wells, lessen-
ing the proportion of cost and making profitable a
useful enterprise, which would otherwise have
to be abandoned.

The conclusion is reached that the lease had
not been abandoned, and that the present owners
had a right to produce the oil by the methods
employed, and the finding of the court is in favor
of the defendants.

*Judgment for defendants.*

FARR and POLLOCK, JJ., concur.